UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

GAUDENCIO GARCIA-CELESTINO *et al.*, individually and on behalf of all other persons similarly situated,

      Plaintiffs,

v.

RUIZ HARVESETING, INC.,
BASILISO RUIZ, individually, and
CONSOLIDATED CITRUS LIMITED
PARTNERSHIP,

      Defendants.

Case No:  2:10-cv-542-FtM-38DNF

_____/

### **ORDER**[1]

This matter comes before the Court on consideration of Consolidated Citrus L.P.'s Case Dispositive Motion for Summary Judgment, Statement of Undisputed Facts and Supporting Memorandum of Law (hereafter "Consolidated's Summary Judgment Motion") (Dkt. #98), filed on May 11, 2012, Plaintiffs' Response in Opposition (Dkt. #119), filed on June 18, 2012, Plaintiffs' Motion for Summary Judgment and Supporting Memorandum of Law Against Consolidated Citrus Limited Partnership (hereafter "Plaintiffs' Summary Judgment Motion") (Dkt. #101), filed on May 11, 2012, and Consolidated Citrus Limited Partnership's Memorandum in Opposition (Dkt. #117), filed

_____

[1]Disclaimer:  Documents filed in CM/ECF may contain hyperlinks to other documents or Web sites. These hyperlinks are provided only for users' convenience.  Users are cautioned that hyperlinked documents in CM/ECF are subject to PACER fees.  By allowing hyperlinks to other Web sites, this court does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites.  Likewise, the court has no agreements with any of these third parties or their Web sites.  The court accepts no responsibility for the availability or functionality of any hyperlink.  Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.

on June 15, 2012.  For the reasons set forth below, the Court grants in part and denies in part Consolidated's Summary Judgment Motion and denies Plaintiffs' Summary Judgment Motion.

## BACKGROUND

**Undisputed Material Facts**[2]

Factual Background

Plaintiffs are migrant and seasonal agricultural laborers hired to pick citrus fruit for Defendant, Consolidated Citrus Limited Partnership ("Consolidated" or "Consolidated Citrus"), during the 2006-07, 2007-08, 2008-09, and 2009-10 harvest seasons.  Dkt. #34, p. 1.  Consolidated Citrus is one of the nation's largest citrus growers, which due to its large harvesting operation, hires farm labor contractors like Defendant Ruiz Harvesting to furnish citrus pickers.  Id. at 7-8; Dkt. #98, p. 7.  Defendant Basiliso Ruiz ("Ruiz") is the owner and president of Ruiz Harvesting.  Dkt. #34, p. 7.

During the 2006-07, 2007-08, 2008-09, and 2009-10 seasons, Ruiz Harvesting furnished two groups of migrant workers to Consolidated Citrus.  The first group traveled from Mexico and was hired through the United States Department of Labor's ("DOL") H-2A agricultural guest worker program.  Id. at 3; Dkt. #98, p. 14.  Under the program, a category of "non-immigrant foreign workers" may be employed for temporary agricultural work within the United States.  Dkt. #34, p. 3.  As a pre-requisite to their employment, Ruiz Harvesting filed a temporary labor certification with the DOL, which verified that (1) there were insufficient domestic workers willing, able, and qualified to

---

[2]The undisputed facts are based on Consolidated's Summary Judgment Motion and Undisputed Facts (Dkt. #98) and Plaintiffs' Statement of Material Facts in Support of Motion for Summary Judgment Against Defendant Consolidated Citrus Limited Partnership (Dkt. #101-1).  The Court cites these documents where facts are undisputed, and otherwise determines facts based on the parties' submissions, affidavits, and deposition testimony.

work at the time and place needed; and (2) the group's employment did not adversely affect the wages and working conditions of domestic workers.   See 8 U.S.C. §§ 1184(c)(1), 1188(a)(1).  The certification application submitted to the DOL included a job offer, commonly referred to as a "clearance order," which described the workers' job terms, most of which were determined by federal regulations governing the H-2A program relating to minimum benefits, wages, and working conditions.  Dkt. #34, pp. 2, 11-12.  These clearance orders functioned as the employment contracts between Ruiz Harvesting and the H-2A workers.  Id.

The H-2A Plaintiffs incurred a variety of out-of-pocket expenses as they traveled from their homes to Consolidated's job site in Florida and from the job site to their homes once the work was completed.  Id. at 13, 16.  For example, Plaintiffs traveled at their own expense to Monterrey, Mexico to apply for their H-2A visas, purchased passports, and paid a variety of fees to be issued their visas.  Id.  The workers incurred additional costs while waiting in Monterrey for their visa applications to be processed and while at the U.S.-Mexico border.  Id.

Ruiz Harvesting also employed non-H-2A guest workers from within the United States.  Id. at 3; Dkt. #98, p. 10.  As a matter of law, Ruiz Harvesting was obligated to provide the same terms and conditions of employment to both the H-2A and non H-2A workers.  Dkt. #98, p. 10.

Plaintiff Francisco Suarez-Galan is a non-H-2A guest worker who was recruited and hired within the United States by Ruiz Harvesting to work on Consolidated's citrus operations during the 2006-07 and 2007-08 harvest seasons.  Dkt. #101-1, p. 8.  The remaining Plaintiffs were hired by Ruiz Harvesting to pick citrus fruit on the fields of

Consolidated Citrus at various points during the 2006-07, 2007-08, 2008-09, and 2009-10 harvest seasons.  Dkt. #34, pp. 10-11.  Plaintiffs were compensated for their work on a "piece-rate" basis based on the number of tubs of fruit harvested.   Dkt. #101-1, p. 12.  In order to record the amount of compensable time worked by Plaintiffs, Ruiz Harvesting utilized an electronic timekeeping system owned and maintained by Consolidated Citrus.  Id. at 13-14; Dkt. #98, pp. 16-17.  The data collected were provided to Ruiz Harvesting for use in preparing the workers' weekly paychecks and for maintaining its payroll records.  Dkt. #34, p. 14.

<u>Plaintiffs' Wage and Hour Claims</u>

Plaintiffs' Amended Complaint alleges that on several occasions, the workers' piece-rate earnings totaled less than the amount due under the applicable adverse effect wage rates.  Dkt. #34, p. 14.  To address these deficiencies, the payroll software utilized by Ruiz Harvesting automatically added supplemental money to the workers' piece-rate earnings so as to boost the earnings to the then-applicable adverse effect wage rate.  Id.  The supplemental money appeared on Plaintiffs' check stubs and direct deposit stubs and was labeled "Minimum Wage H2A."  Id. at 14-15.  At the beginning of each relevant harvest season, Basiliso Ruiz met with Plaintiffs and other workers and explained the piece-rate system used to compute their compensation.  Id. at 15.  Ruiz also explained to the workers that their weekly paychecks might contain income labeled "Minimum Wage H2A," and that any worker receiving this supplemental amount was required to return the money to Ruiz or his staff upon request.  Id.  Throughout the relevant harvest seasons, Plaintiffs received paychecks and/or direct deposits, which

4

included the "Minimum Wage H2A."   On each payday, the workers returned the "Minimum Wage H2A" sums in cash to Ruiz or one of his lieutenants.   Id.

Plaintiffs allege that as a result of these "kickback" practices, they did not receive the minimum wage due under the applicable adverse effect wage rates.   Id.   In addition, Plaintiffs contend that Defendants failed to fully reimburse Plaintiffs for out-of-pocket expenses incurred during their travel to and from Consolidated's citrus farms.   Id. at 16.

Procedural Background

Plaintiffs have filed suit under the Migrant and Seasonal Agricultural Worker Protection Act ("AWPA"), 29 U.S.C. §§ 1801-72., the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, et seq, and the minimum wage provisions of the Florida Constitution.   Additionally, Plaintiffs allege that Defendants breached the terms of their employment contracts by: (1) requiring Plaintiffs to kick back their supplemental wages (Dkt. #101, p. 22); (2) by automatically deducting an hour from each worker's recorded work time during the 2007-08 and 2008-09 harvests (id. at 18); and (3) by failing to reimburse Plaintiffs for their inbound and outbound transportation, subsistence, and other costs associated with obtaining their visas.   Id. at 20.

The Amended Complaint includes six counts.   In Counts I-III, Plaintiff Francisco Suarez Galan assert a claim under the AWPA for violations of the Act's record keeping, wage statement, working arrangement, and wage payment provisions during the 2006-07, 2007-08, and 2008-09 harvest seasons, respectively.   In Count IV, all Plaintiffs allege violations of the minimum wage provisions of the FLSA.   In Count V, all named Plaintiffs, except Suarez-Galan, assert a class-wide claim alleging a breach of their employment contracts with Defendants, the terms of which were supplied by federal

regulations at 20 C.F.R. §§ 653.501, 655.102, 655.103, and.  In Count VI, all named Plaintiffs, except Suarez-Galan, assert a class-wide claim under Article 10, Section 24 of the Florida Constitution, which incorporates the minimum wage provisions of the Florida Minimum Wage Act ("FMWA").  See Art. 10, § 24(e).

On February 24, 2012, this Court certified a class of (Dkt. #81, p. 3):

All temporary foreign workers ("H-2A workers") who were employed pursuant to temporary labor certifications issued to Ruiz Harvesting, Inc. for working during the 2007-08, 2008-09 and/or 2009-10 Florida citrus harvests.

Plaintiffs allege class-wide claims only with respect to Counts V and VI.  On January 6, 2012, this Court dismissed (Dkt. #78) with prejudice the claims of Plaintiffs Urbano Sanchez-Rodriguez, Leopoldo Trejo-Carillo, Roberto Vasquez Escobar, and Israel Ugalde Eguia against Defendants pursuant to their Joint Motion for Approval of Settlement Agreement, filed on November 30, 2011 (Dkt. #69).  In addition, on October 4, 2012, this Court approved a settlement reached between Plaintiff Francisco Suarez Galan and Defendants Ruiz Harvesting, Basiliso Ruiz, and Consolidated Citrus and dismissed Suarez Galan from the case.  Dkt. #144.  Finally, on May 13, 2013, the Court approved a settlement of all of Plaintiffs' claims against Defendants Ruiz Harvesting and Basiliso Ruiz.  Dkt. #160.

## STANDARD OF REVIEW

Summary judgment is warranted when there is no genuine issue as to any material fact.  Fed. R. Civ. P. 56(a).  "An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party."  Baby Buddies, Inc. v. Toys "R" Us, Inc., 611 F.3d 1308, 1314 (11th Cir. 2010) (internal quotation marks and citations omitted).  A fact is "material" if it may affect the outcome

of the case under governing law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The moving party bears the burden of showing the absence of a genuine issue of material fact by identifying relevant pleadings, depositions, answers to interrogatories, admissions, and/or affidavits.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1259-60 (11th Cir. 2004).

To avoid the entry of summary judgment, the non-moving party must offer enough evidence, beyond a mere scintilla, upon which the fact finder could reasonably find a genuine issue of a material fact.  Liberty Lobby, Inc., 477 U.S. at 247-48. However, the non-moving party may not simply rely on beliefs, conjecture, speculation, or conclusory allegations.  Instead, the party faced with a properly supported summary judgment motion must come forward with extrinsic evidence that meets "the substantive evidentiary standard of proof that would apply at trial on the merits," including affidavits, depositions, answers to interrogatories, and/or admissions.  Celotex, 477 U.S. at 322; Hilburn v. Murata Elecs. N. Am., Inc., 181 F.3d 1220, 1225 (11th Cir. 1999).

When evaluating a summary judgment motion, the Court views all evidence and draws all reasonable inferences in favor of the non-moving party.  Scott v. Harris, 550 U.S. 372, 378 (2007); Tana v. Dantanna's, 611 F.3d 767, 772 (11th Cir. 2010).  "If reasonable minds might differ on the inferences arising from undisputed facts, then the court should deny summary judgment."  St. Charles Foods Inc. v. Am.'s Favorite Chicken Co., 198 F.3d 815, 819 (11th Cir. 1999) (internal quotation marks and citations omitted).

When faced with cross motions for summary judgment, a court must consider each motion on its own merits. Shook v. United States, 713 F.2d 662, 665 (11th Cir. 1983). Where both parties "disagree as to the facts and take inconsistent legal theories[,] the mere filing of cross motions for summary judgment does not warrant the entry of such judgment." Id.

## DISCUSSION

Due to the parties' various settlements, Plaintiffs' six-count Complaint has been distilled down to three claims against Consolidated Citrus concerning its obligations under the employment contracts, the FLSA, and Article 10, Section 24 of the Florida Constitution. The parties have filed cross-motions for summary judgment on whether Consolidated Citrus "jointly employed" Plaintiffs during the relevant harvest seasons and was therefore subject to liability. The Court will first examine whether a joint employer relationship existed; next, the Court will determine whether the joint employment inquiry applies to Plaintiffs' breach of contract claims; finally the Court will resolve Plaintiffs' claims under the Florida Constitution and the FMWA.

## A.   Joint Employment Status

Legislative History of the FLSA and the AWPA

Plaintiffs initially brought suit under the FLSA and the AWPA, but have since settled their AWPA claims. Nevertheless, a brief background of both statutes sheds light on which factors to apply when determining whether Consolidated Citrus jointly employed Plaintiffs.

In 1938, Congress enacted the FLSA to alleviate "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and

general well-being of workers . . . ." 29 U.S.C. § 202(a).  The FLSA requires an employer, *inter alia*, to pay employees a minimum hourly wage and overtime.  Id. § 206.  In 1966, Congress amended the FLSA to extend minimum wage protections to certain agricultural workers.  See S. Rep. No. 89-1487 (1966).  The AWPA was enacted in 1983 and was intended "to assure necessary protections for migrant and seasonal agricultural workers . . . ." 29 U.S.C. § 1801.  To this end, the AWPA requires agricultural employers to register with the government, to maintain employment records for workers, and to comply with various compensation, housing, and transportation requirements.  Id. §§ 1811-44.

Consolidated's liability under the FLSA (and the AWPA prior to the settlement) is based in part on whether it "employed" Plaintiffs.  See id. § 1802(2).  In defining "employment," both statutes reject the common-law definition, which is based on agency principles and limiting concepts of control and supervision.  See Walling v. Portland Terminal Co., 330 U.S. 148, 150-51 (1947); Aimable v. Long and Scott Farms, 20 F.3d 434, 439 (11th Cir 1994).  Instead, an entity "employs" an individual under the FLSA and the AWPA if it "suffer[s] or permit[s]" the individual to work.  29 U.S.C. § 203(g); id. § 1802(5).  In other words, an employment relationship exists if, as a matter of economic reality, the individual is dependent on the putative employer.  Goldberg v. Whitaker House Coop., Inc., 366 U.S. 28, 33 (1961); Aimable, 20 F.3d at 439.  Both statutes provide that a worker can be economically dependent on, and thus jointly employed by multiple entities at once.  See 29 C.F.R. § 791.2; id. § 500.20(h)(4).  The issue of joint employment is a question of law.  Bonnette v. Cal. Health & Welfare Agency, 704 F.2d 1465, 1469 (9th Cir. 1983).

Which Factors Apply in the "Joint Employment" Inquiry

Beginning with Aimable, 20 F.3d at 439, the Eleventh Circuit set forth several versions of a multi-factor analysis that must be applied to determine a "joint employment" relationship.   In Aimable, a farm labor contractor hired migrant farm workers to harvest crops for a property owner.   Id.   The farm workers brought claims under the FLSA and the AWPA.   Id.   In determining the existence of an employment relationship between the property owner and the farm workers, the court established an eight-factor test - five of which were derived from the regulations relating to the AWPA and three from case law.   Id. at 438.   Three additional factors were found to be irrelevant.   Id. at 444.   In 1997, the Department of Labor amended the AWPA regulations to clarify the definition of joint employment by recognizing, for instance, that "despite Aimable, the great weight of the case law supports consideration of the degree of permanency and exclusivity" as a factor in the joint employment analysis.   Migrant and Seasonal Agricultural Worker Protection Act, 62 FR 11734-01, 11740.

In response, the Eleventh Circuit revised its test and adopted the following seven factors: (1) whether the employer has the power to direct, control, or supervise the worker or work performed; (2) whether the employer has the power, either alone or in addition to another employer, directly or indirectly, to hire or fire, modify the employment conditions, or determine the pay rates or the methods of wage payment; (3) the degree of permanency and duration of the relationship; (4) the extent to which the services rendered by the worker are repetitive, rote tasks; (5) whether the workers' tasks were integral to the overall business operation of the employer; (6) whether the work  is performed on the agricultural employer's premises; and (7) whether the employer

undertakes responsibilities in relation to the worker which are commonly performed by employers.  See Charles v. Burton, 169 F.3d 1322, 1328-29 (11th Cir. 1999).  The Charles factors were later adopted by Martinez-Mendoza v. Champion Int'l Corp., 340 F.3d 1200, 1208-09 (11th Cir. 2004).

Plaintiffs argue that Charles and its seven-factor test controls.  Consolidated Citrus disagrees (see Dkt. #131, p. 1) and cites to Layton v. DHL Exp. (USA), Inc., 686 F.3d 1172, 1177 (11th Cir. 2012), where the Eleventh Circuit examined the joint employment issue in an FLSA claim, but applied the Aimable factors in lieu of the seven factors set forth in Charles and Champion.  The court in Layton reasoned that in Charles (as in Champion), plaintiffs alleged only AWPA claims, not FLSA claims.  As the court explained, "[a]lthough the AWPA defines joint employment by reference to the definition provided in the FLSA, that does not mean that the reverse holds true – that joint employment under the FLSA is invariably defined by AWPA regulations."  Id.  Thus, the court reasoned that Aimable's eight factor analysis was more appropriate to claims brought forth solely under the FLSA.  Id.

Plaintiffs attempt to limit Layton to the facts before it - an employer-employee relationship between a driver and a shipping carrier - which, Plaintiffs maintain had nothing to do with the purpose of the AWPA or its regulatory factors concerning an agricultural workers' right to minimum wage protections.  The Court declines to read that far into Layton's rationale.  As the Eleventh Circuit made clear, the Charles and Champion test applies only where a court considers an AWPA claim.  Layton, 686 F.3d at 1177 ("The court in Charles was considering only AWPA claims, not FLSA claims.").  Aimable, in contrast, "crafted a definition of 'joint employer' that applies to both AWPA

and FLSA claims and that test has not been disrupted by a case involving [only] FLSA claims or amendments to the FLSA . . . ."  Id.  At no point did Layton limit its analysis to, much less discuss the fact that the employment relationship at issue did not involve agricultural workers.

Here, because the parties have settled their AWPA claims, leaving only the FLSA allegations, the Court will follow Aimable.  In applying the eight factors, we are guided by several principles.  First, in "joint employment" inquiries, the issue is not whether the worker is more or less economically dependent on the labor contractor or the grower, with the prevailing party avoiding responsibility as an employer.  Rather, the task is to determine whether a single employee or worker may have a simultaneous employment relationship with a grower and labor contractor.  Thus, "[t]he focus . . . must be on each employment relationship as it exists between the worker and the party asserted to be a joint employer."  Antenor v. D&S Farms, 88 F.3d 925, 932 (11th Cir. 1996) (citing House Report at 4553-54).  Second, no factor is individually determinative as the existence of a joint employment relationship depends on the "'economic realities' of all the circumstances."  Aimable, 20 F.3d at 439.  Third, the factors are indicators of economic dependence: "aids-tools to be used to gauge the degree dependence of alleged employees on the business to which they are connected."  Usery v. Pilgrim Equip. Co., 527 F.2d 1308, 1311 (5th Cir. 1976).  "Thus, the weight of each factor depends on the light it sheds on the farmworkers' economic dependence (or lack thereof) on the alleged employer, which in turn depends on the facts of the case . . . ."  Antenor, 88 F.3d at 932-33.  Fourth, no concrete formula applies to determine the joint employment relationship.  The absence of evidence on any one or more of the factors does not preclude a joint

employer finding.  Instead, the factors must be collectively and qualitatively weighed to assess the evidence of economic dependence.  Id. at 933 (citing House Report at 4553).  Finally, the FLSA is a remedial statute and must, therefore, be broadly construed.  Antenor, 88 F.3d at 933.

### a.  The Nature and Degree of Control over Plaintiffs

The first factor examines a putative employer's power to direct, control, or supervise a worker.  "Control arises . . . when the [employer] goes beyond general instructions . . . and begins to assign specific tasks, to assign specific workers, or to take an overly active role in the oversight of the work."  Layton, 686 F.3d at 1178 (citing Aimable, 20 F.3d at 441).  An "overly active" role includes deciding "(1) for whom and how many employees to hire; (2) how to design the employees' management structure; (3) when work begins each day; (4) when the laborers shall start and stop their work throughout the day; and (5) whether a laborer should be disciplined or retained."  Layton, 686 F.3d at 1178 (quoting Champion, 340 F.3d at 1209-10).

Plaintiffs assert several forms of control that allegedly indicate a joint employment relationship.  First, Plaintiffs contend that Consolidated Citrus controlled the number of workers employed and their terms of employment by mandating that they be hired through the H-2A program.  Dkt. #101, p. 9; Dkt. #101-1, p. 4.  This fact, alone, has little bearing on whether Consolidated took an "overly active" role in the oversight of Plaintiffs' work.  As a contractor of immigrant labor and as a prerequisite to recruiting the H-2A workers, Ruiz Harvesting was required to show that a shortage of domestic workers were available for the harvesting operation and that it was able to provide housing and daily transportation to the H-2A immigrants.  Dkt. #98, pp. 14, 28; Dkt

#101-1, p. 10.[3]  That Consolidated Citrus sought out workers through this program does not indicate control over the hiring process or the number of employees hired.  If it did, an employer would be deemed to have sufficient control anytime it recruited H-2A workers through a labor contractor.

Next, Plaintiffs argue that Consolidated controlled the size of the harvesting crews by calculating the estimated volume of fruit expected to be picked and the number of contract laborers needed to harvest the fruit.  The record shows that Consolidated would then speak with Ruiz Harvesting about whether it could recruit the necessary labor to handle the expected harvest.  See Shelton Dep., Dkt. #101-4, pp. 23-24, 34-37.  If Ruiz was able to certify and recruit additional workers, it would ask Consolidated whether more work was available.  Id., pp. 65-66.

In similar circumstances, the Eleventh Circuit held that an employer did not exercise sufficient control.  In Aimable, the employer discerned "the amount of produce that could be harvested and, therefore, the exact amount of work available."  20 F.3d at 440.  However, the labor contractor determined the number of available workers,

------

[3]For instance, the following testimony by Defendant's harvesting manager reveals that Consolidated had little role in dictating the number of laborers hired through the H-2A program:

> Q.  So I understand the H-2A system, the employers, in this case the labor contractors, have to put an application in to the government and specify the number of workers they need?
> A.  Yea.
> Q.  How do you get the information to these labor contractors that they should bring so many workers so they can fill their temporary labor certifications?
> A.  They tell me.  They tell me how many they can bring, based off their housing and transportation.
> Q.  Well, do you ever get a situation where they would all like to bring more, because they figure they'll make more money the more people they have?
> A.  No.  They can't bring no more than they have got transportation and housing for.  And they don't all work solely for me.

Deposition of Delbert Gary Shelton, Jr. taken on January 26, 2012, Dkt. #101–4 ("Shelton Dep."), pp. 36-37.

recruited those workers, and compensated them for their labor.  Id.  That hiring process, which resembles the case at hand, did not indicate a joint employment relationship.  Id.

Third, Plaintiffs argue that Consolidated routinely instructed Ruiz Harvesting and its workers on the day-to-day citrus operations.  To assess this claim, the Court must distinguish between "agricultural decisions [that] . . . can not be likened to 'control,'" from "specific indicia of control" that go beyond general instruction and imply a joint employment relationship.  Id. at 441.  Agricultural decisions encompass general determinations that only indirectly affect the nature and amount of work done, such as the overall amount of produce that must be harvested, which crops to harvest at a particular time, and which portion of groves to harvest in light of crop damage.  Id.  On the other hand, more specific and direct employment decisions indicative of a joint employment relationship include directing specific workers to pick a certain amount of acres in a given day or to perform specific tasks, deciding when work must begin on a particular day, whether a worker should be disciplined, and whether the employer was free to delay or stop the workers directly from continuing their work.  Antenor, 88 F.3d at 933-34.

Here, rather than assuming an "overly active role" in the citrus picking, Consolidated issued general instructions to Ruiz Harvesting about its harvesting operations.  For example, Consolidated informed labor contractors of its seasonal estimates of fruit expected from certain groves (Shelton Dep., Dkt. #101-4, pp. 23-26); directed labor crews to enumerated citrus groves based on crew size and availability (Dkt. #98, p. 12) (citing Shelton Dep., Dkt. #101-4, pp. 93-98); dictated when crews should stop working on groves affected by freeze damage or because of mechanical

failures in the harvesting plants (Dkt. #98, p. 29 (citing Deposition of Charles G. Berginc, Jr. taken on March 27, 2012 ("Berginc Dep.")), Dkt. #101-8, pp. 26-27; Dkt. #101-1, p. 23 (citing Shelton Dep., Dkt. 101-4, pp. 164-165)); and established certain decontamination procedures for workers exposed to citrus canker diseases.  Dkt. #101, p. 11; Dkt. #101-1, p. 10.

As in Aimable, these types of general agricultural decisions are not indicative of "control."  Nor are they surprising, given that Consolidated's business is growing and selling citrus.  See Aimable, 20 F.3d at 441 ("It is not surprising that Long & Scott would . . . give general instruction to Miller as to which crops to harvest at a particular time," or which fields to pick on specified days given that "Long & Scott's business is growing and selling vegetables."); Howard v. Malcolm, 852 F.2d 101, 104 (4th Cir. 1988) (finding no joint employment even though employer instructed contractor on "which portion of the crop to harvest in light of the crop damage," and despite a contract providing the putative employer broad supervisory powers over the planting and harvesting of the crops).

To be sure, Plaintiffs have pointed to some examples of control, including when Consolidated directed certain workers to move from grove to grove as work was completed (Dkt. #101-1, pp. 22-23) (citing Shelton Dep., Dkt. #101-4, pp. 95-96; Deposition of Bernardo Rodriguez taken on March 27, 2012 ("Rodriguez Dep."), Dkt. #101-9, pp. 11-12)), and instructed others to stop work for leaving a mess or for failing to follow proper picking practices.  Dkt. #101, p. 11 (citing Rodriguez Dep., Dkt. #101-9, p. 32; Berginc Dep., Dkt. #101-8, p. 26).  See Charles, 169 F.3d at 1330 (finding control where the employer "determined the particular fields that they wanted the [workers] to

cultivate, determined when the [workers] would begin picking each field, and supplied [the workers] with boxes . . . ."); Champion, 340 F.3d at 1209-10 (noting that control arises when a grower determines when the laborers shall start and stop their work). However, as a whole, the record on summary judgment reflects that Consolidated was merely ensuring that the citrus was properly picked, without involving itself with the specifics of the task, such as the training, management, or disciplining of employees.

Therefore, the Court finds that this factor weighs against a finding of joint employment.

### b.   The Degree of Supervision, Direct or Indirect, of Plaintiff's Work

The second factor bearing on a joint-employment relationship concerns the degree of direct or indirect supervision Consolidated Citrus enjoyed over Plaintiffs' work. Aimable, 20 F.3d at 441.   In an agricultural setting, supervision may "include[] overseeing the pickers' work and providing direction, while keeping in mind 'special aspects of agricultural employment.'"   Charles, 169 F.3d at 1330 (quoting Antenor, 88 F.3d at 934-35).   For example, "the grower is not expected to look over the shoulder of each farmworker each hour of every day."   Antenor, 88 F.3d at 935.   Thus, "[i]t is well settled that supervision is present whether orders are communicated directly to the laborer or indirectly through the contractor."   Id.   However, "[i]nfrequent assertions of minimal oversight," do not satisfy the supervision necessary under this factor.   Id.

In this case, the evidence indicates that Consolidated Citrus supervised Plaintiffs in substantial ways.   Consolidated enlisted the help of harvesting supervisors and other personnel to roam and inspect the citrus groves, (Dkt. #101-1, p. 23); to direct incoming laborers to particular groves, (Berginc Dep., Dkt. #101-8, p. 11); to assign laborers to

new groves as each section was sufficiently cultivated; (Dkt. #101-1, p. 10 (citing Rodriguez Dep., Dkt. #101-9, pp. 11-12; Berginc Dep., Dkt. #101-8, pp. 11-12)); and to conduct quality inspections designed to minimize the workers' poor picking practices. Dkt. #101-1 at 11 (citing Rodriguez Dep., Dkt. #101-9, pp. 15-18).   In addition, Consolidated's harvesting supervisors regularly communicated with Ruiz Harvesting and other contractors regarding Plaintiffs' work.   Dkt. #101-1, pp. 23-24; see Charles, 169 F.3d at 1330 ("[S]upervision is present whenever orders are communicated directly to the laborer or indirectly through the contractor.").

Thus, while some of the incidents described above do not necessarily indicate direct control over the workers, their employment, or their management structure, they do reflect "supervision more substantial than the 'infrequent assertions of minimum supervision,' by the grower in Aimable," who "except on rare occasions, left supervision and oversight of [the farmworkers] entirely to [the contractor] and his crew and 'rarely provided any direction to [the farmworkers] work.'"   Antenor, 88 F.3d at 935 (quoting Aimable, 29 F.3d at 441).

Consolidated responds that Plaintiffs were unaware of Consolidated or its role in the harvesting process and that only the equipment operators employed by Ruiz Harvesting were seen supervising their work.   See Dkt. #98, pp. 18-19 (citing e.g., Deposition of Ernesto Aguilar-Bocanegra taken on June 20, 2011, Dkt. #55-14, p. 44; Deposition of Antonio Martinez-Martinez taken on June 24, 2011, Dkt. #98-9, p. 8; Deposition of Miguel Sanchez-Morales taken on June 22, 2011, Dkt. #98-10, pp. 41-42; Deposition of Israel Ugalde-Eguia taken on June 23, 2011, Dkt. #98-13, p. 53). Regardless of whether Plaintiffs were cognizant of the supervision, the record clearly

demonstrates that Consolidated personnel monitored and supervised the workers either directly or indirectly through Ruiz Harvesting.  Luna v. Del Monte Fresh Produce (Se.), Inc., No. 1:06-CV-2000-JEC, 2008 WL 754452, at *4 (N.D. Ga. Mar. 19, 2008) (concluding that plaintiffs' awareness of the supervision was irrelevant to the degree of supervision exercised).

For these reasons, the Court holds that this factor weighs in favor of finding joint employment.

### c. The Authority to Directly or Indirectly Hire, Fire, or Modify Plaintiffs' Employment Conditions

Next, the Court must examine Consolidated's power to directly or indirectly, hire, fire, or modify Plaintiffs' employment conditions.  Aimable, 20 F.3d at 442.  Plaintiffs argue that Consolidated indirectly controlled Plaintiffs' employment by determining when the harvesting season began, where it took place, how long it would last, and how many workers were needed to harvest a specific grove.  Dkt. #101, p. 12 (citing Dkt. #101-1, p. 22).

As an initial matter, some of Plaintiffs' assertions are not consistent with the record.  For example, Plaintiffs cite to the Deposition of Delbert Gary Shelton, Jr., the harvesting area manager for Consolidated Citrus, to assert that Consolidated instructed Ruiz Harvesting on when the harvest would begin and the number of workers needed to cultivate a specific block on a daily basis.  Dkt. #101-1, p. 22.  However, the record cited merely reflects that before each harvesting season, Ruiz Harvesting and other labor contractors informed Mr. Shelton of the number of workers they expected to hire

through the H-2A program.  Consolidated would then determine whether enough work existed based on its seasonal estimates of the expected yield of citrus.[4]

Moreover, Plaintiffs' remaining assertions of general authority over the harvesting operation and its indirect impact on the hiring process are less substantial than instances where courts have found economic dependence.  For example, in Antenor, the employer indirectly controlled the employment conditions of the workers where it had the power to "veto" the contractor's hiring decisions, dictate the workers' specific hours, decide when the work was to begin each day, force the workers to stop harvesting when prices were bad, and substitute its own workers in fields assigned to the contract laborers.  88 F.3d at 935.  Similarly in Charles, economic dependence was found where the employer decided when the workers needed to cultivate the crop, where they would pick it, and for how long.  169 F.3d 1330-31.  Cf. Champion, 340 F.3d at 1212 (rejecting plaintiffs' argument that defendant possessed the power to modify

---

[4]Mr. Shelton's deposition testimony stated the following (Dkt. #101-4, p. 65-66 ):

> Q.  Well, okay.  But if I'm one of your contractors, let's say Mr. Ruiz in prior years, do you let Mr. Ruiz know in advance that you're going to have the same number of loads as last year, more or less?  How does that work?
> A.  He would tell me how many people that he's got housing for, like I had said before.
> Q.  Okay.
> A.  And according to my matrix, he may say, "Can I bring 60 people?"
> Q.  Okay.  Well, for example, one year in this particular situation, Mr. Ruiz roughly doubled the number of workers he brought.  And his workers worked exclusively for Consolidated.
> A.  Okay.
> Q.  Or on Consolidated's groves.
> A.  Okay.
> Q.  And that's something he might come to you and say, I'd like to bring – I have housing for twice as many people as I did last year, can you use me for that?  Is that the kind of conversation you might have him with?
> A.  I might, yes, sir.

their employment conditions because of the employer's contractual right to stop planting due to adverse weather or pool soil conditions).[5]

In contrast, here, Ruiz Harvesting had near exclusive authority to hire and fire the workers (Dkt. #98, p. 13; Shelton Dep., Dkt. #101-4, pp. 34-37; 65-66) and to determine when work began and ended.   Berginc Dep., Dkt. #101-8, pp. 71-72.   There is no evidence that Consolidated mandated that a particular individual be hired or fired, that it dictated the hours of any given employee, or that it changed the pay classification or benefits of any laborer.   Compare Aimable, 20 F.3d at 442 (finding no dependence where grower did not dictate the hours or working conditions of laborers) with Hodgson v. Griffin & Brand of McAllen, Inc., 471 F.2d 235, 237 (5th Cir. 1973) (finding dependence where field supervisors instructed contractors to begin work at a certain hour and assigned them certain rows or patches to harvest each day).

For these reasons, this factor weighs against a finding of a joint employment.

### d.   The Power to Determine Pay Rates or Methods of Payment

The next factor is the degree to which Consolidated Citrus is authorized to determine Plaintiffs' pay rates or the methods of payments.   Aimable, 20 F.3d at 442-43. The Court cannot assess this factor on summary judgment.

Plaintiffs declare that Consolidated directly or indirectly established two pay rates prior to the start of each harvest season and before each grove of citrus was cultivated. First, through its harvesting supervisors, Consolidated determined the picking price or

---

[5]Plaintiffs argue that Consolidated had an effective "veto" over Ruiz Harvesting's employment decisions by requiring that the workers participate in the H-2A immigration program.   This is not the form of veto contemplated by Antenor.   There, the employer had the power to monitor the workers' job qualifications and to ensure that they complied with the relevant immigration laws.   Antenor, 88 F.3d at 935. Consolidated has no such authority.   As explained above, Ruiz Harvesting was independently responsible for recruiting workers through the H-2A program and for complying with the relevant labor certification requirements.

pick rate to be paid to each worker hired by Ruiz Harvesting.  Dkt. #101-1, p. 12 (citing Deposition of Christopher Reyes, taken on March 27, 2012 ("Reyes Dep."), Dkt. #101-7 at 32).  The pick rate was determined by an internal chart developed by Consolidated based on historical data regarding previous yields of citrus.  Dkt. #101-1, p. 12 (citing Shelton Dep., Dkt. #101-4; Ex. 20; Bergnic Dep., Dkt. #101-8).  Second, Consolidated set forth a roadside rate to be paid to Ruiz Harvesting, which reflected the labor contractor's profit and overhead, and was directly correlated with the pick rate – as the pick rate increased, so did the roadside rate.  Dkt. #101-1, p. 12.  According to Plaintiffs, before the harvesting began, Consolidated provided Ruiz Harvesting with the appropriate pick rate for each specific grove.  Id. (citing Reyes Dep., Dkt. #101-7, pp. 34-36).  If Ruiz Harvesting disagreed with the pick rate, it could request that the pick rate be adjusted.  Id. at 13.  Plaintiffs contend that the final price of the pick rate was ultimately determined by Consolidated Citrus.  Id. (citing Berginic Dep., Dkt. #101-8, p. 50; Reyes Dep., Dkt. #101-7, pp. 37-38).

In contrast, Consolidated points to portions of the record that suggest Ruiz Harvesting determined the pick rate price and occasionally paid its workers at different rates than the overall roadside rates offered by Consolidated.  See, e.g., Dkt. #98, pp. 30-31 (citing Affidavit of Michael J. Bartos ("Bartos Aff."), dated March 11, 2012 Dkt. #99-1, p. 2); Dkt. #98, p. 13 (citing Deposition of Michael J. Bartos ("Bartos Dep."), taken on June 10, 2011, Dkt. #101-5, pp. 92-93).[6]

---

[6]For instance, Mr. Bartos, the Director of Human Resources for Consolidated Citrus, testified to the following (Bartos Dep., Dkt. #101-5, pp. 92-93):

> Q. Well, okay.  Who figures out the compensation?
> A. Gary Shelton does out in the field.  He determines what the – what the rate is going to be.

Accordingly, the Court finds that there is a genuine issue of fact regarding whether Consolidated or Ruiz Harvesting determined the pay rates for the workers. Thus, for summary judgment purposes, the Court excludes this factor from its joint employment analysis.

e.  Consolidated's Preparation of Payroll and Payment of Plaintiffs' Wages

Consolidated did not prepare or issue Plaintiffs' payroll checks.  Instead, Ruiz Harvesting completed its payroll using its own payroll processing company, issued its own checks, paid the applicable taxes, and provided workers compensation insurance. Dkt. #98, p. 34.

Plaintiffs argue that Consolidated conducted random audits of and indirectly controlled the workers' wages through its electronic time-keeping system, which required that Ruiz Harvesting pay Plaintiffs' wages through a direct bank deposit and to submit a payroll report showing the amount of wages paid to each worker.  Dkt. #101, p. 15.  However, the time-keeping system merely generated raw data that was used by Ruiz Harvesting to create weekly payroll records.  Dkt. #98, pp. 16-17; Bartos Aff., Dkt. #99-1, pp. 5-6.  Thus, the record on summary judgment shows that Ruiz Harvesting was ultimately responsible for compensating Plaintiffs.  For these reasons, this factor weighs against a joint employment relationship.

---

Q.  Well, he determines what the piece-rate to the picker is, doesn't he, or does he determine some other rate?
A.  Oh he says, I'm going – to the contractor, I'm going to pay you 1.45 or 1.50 to pick this fruit.
Q.  Okay.  So let's say he says – this grove is a little tougher grove, using this as an example.  I'm going to pay 1.50, which is eight cents above what is stated here.  Then how is the pick rate adjusted?
A.  The contractor pays whatever he wants for the pick rate.
Q.  Well, Mr. Ruiz testified in his deposition that he is told the pick rate by the harvesting supervisor, so I'm trying to figure out how this happens.  Is your understanding something different?
A.  My understand is we – we offer the contractor a – what I call roadside.

f.   Whether the Work Was Performed on Consolidated's Premises

This factor is probative of joint employment because "without the land, the worker might not have work, and because a business that owns or controls the worksite will likely be able to prevent labor law violations, even if it delegates hiring and supervisory responsibilities to labor contractors." Antenor, 88 F.3d at 937. The parties agree that Plaintiffs worked exclusively on Consolidated's premises. Thus, this factor weighs in favor of a joint employment relationship.

g.   Whether Plaintiffs' Work Was Integral to Consolidated's Business

This factor assesses whether Plaintiffs' activities are integral to Consolidated's overall harvesting operation and "[are] probative of joint employment because a worker who performs a routine task that is a normal and integral phase of the grower's production is likely to be dependent on the grower's overall production process." Antenor, 88 F.3d at 937. Consolidated does not dispute that picking citrus is an essential part of its business. This factor weighs in favor of a joint employment relationship.

h.   Consolidated's Investment in Equipment and Facilities

Finally, this Court must consider the relative degree of investment in equipment and facilities by Ruiz Harvesting and Consolidated Citrus. See Rutherford Food Corp., 331 U.S. 722, 730 (1947); Antenor, 88 F.3d at 937, n. 15 (concluding that even though Aimable found this factor irrelevant to its joint employment inquiry, it stopped short of holding that it never is relevant in joint employment cases). "This factor is probative because of the workers' economic dependence on the person who supplies the equipment and facilities." Antenor, 88 F.3d at 937.

Neither party specifically briefed this section because both sides assumed until after the Summary Judgment motions were filed that Charles and its seven factor test controlled. Charles examined an employer's investment in equipment and facilities, but only as one of several indicators of its seventh factor – whether an employer undertook responsibilities in relation to the workers that employers commonly perform. See Charles,169 F.3d at 1333; Champion, 340 F.3d at 1214. As a result, this factor does not aid our joint-employment analysis.

Overall, on summary judgment grounds, this Court is unable to make a final determination of whether Consolidated Citrus "jointly employed" Plaintiffs. Some factors favor Plaintiffs: the degree of supervision exercised by Consolidated Citrus, that Plaintiffs' work was performed on Defendant's premises, and that the work was integral to Defendant's citrus operation. Others favor Defendant: the lack of actual control exercised over the workers, the absence of authority to hire, fire, or alter the employment conditions of the workers, and that Defendant did not prepare payroll or pay the workers. The two remaining factors cannot be determined on summary judgment: Consolidated's power to determine pay rates or methods of payment, and its relative investment in the equipment and facilities used in the harvesting operations. The authority to determine pay rates and methods of payment is especially probative here because Plaintiffs' claims rely, in large part, on an alleged kickback scheme utilized by Ruiz Harvesting to deny minimum wage to the workers.

As a result, the Court denies both parties' summary judgment motions on the joint employment issue.

**B. Breach of Contract Claims**

1. Whether Layton's Joint Employment Analysis Applies to Plaintiffs' Breach of Contract Claims

Plaintiffs' Summary Judgment Motion attempts to impute liability on Consolidated Citrus under both the FLSA and the H-2A regulations governing their breach of contract claims. Even though the Court is unable to resolve the joint employment issue on summary judgment, we must still determine whether Aimable's "joint employment" analysis applies to Plaintiffs' breach of contract claims.

The parties' summary judgment motions assume that the "joint employment" analysis is the same under the FLSA and their breach of contract claims. In other words, they maintain that a common definition of "employ" applies to Plaintiffs' claims under the FLSA and the H2A regulations. That is not the case.

As explained earlier, the joint employment inquiry is predicated on the "suffers or permits to work" language found in the FLSA and the AWPA. See Aimable, 20 F.3d at 438. The parties assume correctly that because the H-2A regulations adopt the "suffers or permits to work" language, a joint employer under the FLSA is deemed to be an "employer" under the H-2A contracts. See Salazar-Calderon v. Presidio Valley Farmers Ass'n, 765 F.2d 1334 (5th Cir. 1985) (labor contractor that petitioned for H-2A guest workers and individual growers who used H-2A workers' services were joint employers); Hernandez v. Two Bros. Farm, LLC, 579 F. Supp. 2d 1379, 1383 (S.D. Fla. 2008) (noting that "the [H-2A] regulations contemplate that an employee may have joint employers"); Guijosa-Silva v. Wendell Roberson Farms, Inc., No. 7:10-CV-17 (HL), 2012 WL 860394, at *19 (M.D. Ga. Mar. 13, 2012) (concluding that the employer/employee relationship under the H-2A contracts are almost identical to the

standards set by the FLSA).   However, a closer look at the H-2A regulations reveals that for one of the harvest seasons at issue, the Department of Labor materially changed the definitions of "employer" and "employee."

Plaintiffs' allegations relate to four harvest seasons during which workers were employed by Ruiz Harvesting to pick citrus on Consolidated's farms: 2006-07, 2007-08, 2008-09, and 2009-10 seasons.   The 2006 H-2A regulations, first implemented in 1987, define "employer" as:

> [A] person, firm, corporation or other associate or organization which suffers or permits a person to work and (1) which has a location within the United States . . . and (2) which has an employer relationship with respect to employees under this subpart as indicated by the fact that it may hire, pay, fire, supervise or otherwise control the work of any such employee . . . . Such an association, however, shall be considered as a joint employer with an employer member if it shares with the employer member on or more of the definitional indicia.

20 C.F.R. § 655.100(b) (2006).   In December 2008, the H-2A regulations were modified and the term "employer" was revised to read:

> Employer means a person, firm, corporation or other associate or organization that (1) has a place of business . . . in the U.S. . . . ; (2) Has an employer relationship with respect to H-2A employees or related U.S. workers under this subpart . . . .

20 C.F.R. § 655.100(c)(2009).   The regulations also added the term "employee":

> Employee means employee as defined under the general common law of agency.   Some of the factors relevant to the determination of employee status include: the hiring party's right to control the manner and means by which the work is accomplished; the skill required to perform the work; the source of the instrumentalities and tools for accomplishing the work; the location of the work; the hiring party's discretion over when and how long to work; and whether the work is part of the regular business of the hiring party.   Other applicable factors may be considered and no one factor is dispositive.

Id.  Significantly, the 2009 H-2A regulations omitted the "suffers or permits to work" language from the definition of "employer" and specified that the term "employee" was defined under the general common law of agency.  And while the 2009 regulations set forth a series of factors to consider under the agency analysis, which resemble the Aimable factors, the two analyses are different.

As the Supreme Court made clear, the FLSA's definition of "employee" to mean "suffers or permits to work," is striking in its breadth and "stretches the meaning of 'employee' to cover some parties who might not qualify as such under a strict application of traditional agency law principles."  Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 325-26 (1992).[7]  Moreover, the Eleventh Circuit has reiterated that in considering the joint employment relationship in the FLSA context, "we must not allow common-law concepts of employment to distr[a]ct our focus from economic dependency . . . . Indeed, the 'suffers or permits to work' standard was developed to assign responsibility to businesses that did not directly supervise putative employees." Antenor, 88 F.3d at 933.

Therefore, because the H-2A regulations were modified to remove the "suffers or permits to work" language in December 2008, Aimable's joint employment analysis only applies to workers employed before the changes were made.  The record shows that the clearance orders that function as Plaintiffs' employment contracts for the 2007-08 and 2008-09 seasons were signed on September 10, 2007 and July 16, 2008

---

[7]In fact, the explanatory guidelines of the most recent H-2A regulations explain that the terms "employer" and "employee" were previously defined under common law agency principles.  They further note that because the common law test and the analysis applicable to the "suffers or permits to work" language are distinct, the regulations removed the "suffers or permits to work" language to clarify that agency principles should dictate an employee-employer relationship.  See Temporary Agricultural Employment of H-2A Aliens in the United States, Modernizing the Labor Certification Process and Enforcement, 73 FR 77110, 77197 (2008).

respectively.  See Dkt. #55-2, p. 9; Dkt. #55-3, p. 9.  The clearance order for the 2009-10 harvest season does not bear a date of execution.  See Dkt. #55-4.  For these reasons, the Court concludes that while Aimable's joint employment analysis applies to the breach of contract claims relating to the 2007-08 and 2008-09 harvest seasons, the same cannot necessarily be said for the 2009-10 season.[8]

## C. Minimum Wage Claims Under the Florida Constitution and the FMWA

In Count VI of their Amended Complaint, Plaintiffs assert violations of the minimum wage provisions of Article X, Section 24 of the Florida Constitution. Consolidated Citrus seeks dismissal based on Plaintiffs' failure to provide pre-suit notice of their intent to bring a claim for unpaid minimum wages as required by the FMWA – an enabling act to Article X, Section 24.  See Fla. Stat. Ann. § 448.110(6)(a).

On November 2, 2004, the Florida electorate passed an amendment to the Florida Constitution, Article X, Section 24, which provides that all working Floridians are entitled to a minimum wage adjusted each year to account for inflation and a variety of wage indexes.  Fla. Const. art. X, § 24(c).  Subsection (e) of the Amendment authorizes employees to bring a civil action to enforce the provisions of Section 24 and subsection (f) provides that implementing legislation is not required to enforce the constitutional provision but that the "state legislature may by statute . . . adopt any measures appropriate for the implementation of this amendment."  Id. § 24(e), (f).  Accordingly, on

---

[8]On March 29, 2013, the Court directed the parties to submit supplemental briefings regarding this issue and on whether Aimable or Charles controlled the joint-employment inquiry.  Dkt. #153.  Plaintiffs' Supplemental Brief Regarding Employer Status of Consolidated Citrus Limited Partnership (Dkt. #156, pp. 8-9) appears to acknowledge that the H-2A contracts relating to the 2009-10 harvest season must be examined under agency principles and the factors set forth in the regulations' definition of "employee".  To the extent that the clearance order applicable to the 2009-10 harvest season was signed after the 2009 H-2A regulations went into effect, this Court agrees.  However, the Court will defer ruling on this matter.

December 12, 2005, the Florida legislature passed the FMWA in order to implement the minimum wage requirements of Article X, Section 24.  See Fla. Stat. Ann. § 448.110(2).

The FMWA mimics Section 24 but adds a few provisions, including the requirement that an aggrieved party must provide written pre-suit notice of the intent to initiate an action.  Id. § 448.110(6)(a).  The notice must identify the minimum wage due, the actual or estimated work dates and hours for which payment is sought, and the total amount of unpaid wages through the date of the notice.  Id.  The employer shall then have fifteen calendar days after receipt of the notice to pay the unpaid wages due or otherwise resolve the claim to the satisfaction of the person aggrieved.  Id. § 448.110(6)(b).

The question is whether Plaintiffs, who have filed suit under Article X, Section 24 must nonetheless abide by the notice requirement of the FMWA.  Florida courts are split on this issue.  Plaintiffs urge this Court to follow Throw v. Republic Enter. Sys. Inc., No. 8:06-cv-724-T-30TBM, 2006 WL 1823783, at *2 (M.D. Fla. June 30, 2006), which concluded that the notice provision of the FMWA prohibitively restricts a right guaranteed by the Florida Constitution - the right to bring suit to recover unpaid minimum wages.  After acknowledging it as a "close question," Throw explained that subsection (f) of the Florida Amendment creates an independent constitutional right to bring suit to recover unpaid minimum wages by providing that "[i]mplementing legislation is not required to enforce this amendment."  Id.  Thus, the FMWA's notice provision unconstitutionally interferes with Section 24 by obstructing an aggrieved party's right to seek relief.  Id.  Accordingly, the court held that plaintiff did not need to

satisfy the notice requirements of the FMWA in order to allege a violation of Article X, Section 24.  Id.

The Court in Resnick v. Oppenheimer & Co. Inc., No. 07-80609-CIV, 2008 WL 113665, at *2 (S.D. Fla. Jan. 8, 2008) disagreed and upheld the validity of the FMWA's 15-day notice requirement.  Resnick held that although subsection (f) declares that no implementing legislation is necessary, it goes on to emphasize that the "state legislature may by statute . . . adopt any measures appropriate for the implementation of this amendment."  Id. (citing Fla. Const. art. X, § 24(f)).  Thus, while the Florida electorate aimed to independently ensure a worker's constitutional right to a minimum wage, the people of Florida nevertheless "authorized the legislature, in its wisdom, to enact legislation that would implement the constitutional right."  Resnick, 2008 WL 113665, at *2.  Accordingly, the court reasoned that because the 15-day notice requirement does not "prevent an individual from enforcing his right under the Florida Constitution," the notice requirement is valid and constitutional.  Id. at *3.

This Court respectfully disagrees with Throw and adopts the conclusion reached by Resnick, and later followed in Dominguez v. Design by Nature Corp., No. 08-20858-Civ, 2008 WL 4426721 (S.D. Fla. Sept. 25, 2008) and Ramirez v. Martinez, No. 08-21863-CIV, 2009 WL 199786 (S.D. Fla. Jan. 23, 2009); but see Bates v. Smuggler's Enters. Inc., No. 2:10-cv-136-FtM-29DNF, 2010 WL 3293347, at *4 (M.D. Fla. Aug. 19, 2010) (concluding that while the FMWA's notice provision is constitutional, a claim under article 24 need not comply with the statute's notice requirement).  The Florida Supreme Court has explained that where there is a self-executing constitutional cause of action, "the Legislature may provide additional law addressing a self-executing

constitutional scheme assuming that such laws supplement, protect, or further the availability of the constitutionally conferred right, but the Legislature may not modify the right in such a fashion that it alters or frustrates the intent of the framers and the people." Browning v. Fla. Hometown Democracy, Inc., PAC, 29 So.3d 1053, 1064 (Fla. 2010). The FMWA does not frustrate the intent of Section 24. It provides employers a means to more quickly resolve wage disputes before a lawsuit is filed. Moreover, the workers' rights are protected because the statute of limitations is tolled during the 15-day notice period. Fla. Stat. § 448.110(6)(b). In effect, the legislature has regulated the method of the Amendment's enforcement as it is expressly authorized to do by the constitutional provision. Thus, the FMWA aims to protect both the employer and the employee, by ensuring the right to seek relief for unpaid minimum wages while protecting employers from being unfairly inundated with lawsuits. This dual focus on the employer and the employee is consistent with the Amendment's public policy section, which provides that both employees and employers stand to benefit from the implementation of the Amendment because employees are protected by an assurance that they will be paid a minimum wage that is "sufficient to provide a decent and healthy life," while employers benefit because the minimum wage requirement protects them "from unfair low-wage competition . . . ." Fla. Const. art. X, § 24(a). This Court's conclusion is buttressed by its obligation "to construe a statute in such a way as to render it constitutional if there is any reasonable basis for doing so." Aldana v. Holub, 381 So. 2d 231, 237-38 (Fla. 1980).

In addition, construing the FMWA and the Amendment, as the Bates court did, to provide separate causes of action – one with a notice requirement and one without –

ignores the purpose of the FMWA as an implementing legislation to the Amendment. See Bates, 2010 WL 3293347, at *4 (holding that the FMWA "is not the exclusive remedy to enforce the constitutional provision," and that a cause of action under Section 24 does not need to adhere to the notice requirement). Prior to the FMWA, the Amendment served as the sole means of providing a cause of action to enforce the right to receive minimum wages. Once the FMWA was enacted, it supplemented Article 24, which could no longer be viewed in isolation from its implementing legislation. Section 448.110(10) specifies that the legislation "shall constitute the exclusive remedy under state law for violations of s. 24, Art. X of the State constitution." Allowing a cause of action to proceed under the Amendment without meeting the notice requirement renders Section 448.110(10) and the FMWA meaningless.

Accordingly, because Plaintiffs did not comply with the FMWA's pre-suit notice requirement, Plaintiffs' minimum wage claim under the Florida Constitution (Count VI) is dismissed and Defendant's Summary Judgment Motion is granted on this issue.

Accordingly, it is now

**ORDERED:**

(1) Consolidated Citrus L.P's Case Dispositive Motion for Summary Judgment, Statement of Undisputed Facts and Supporting Memorandum of Law (Dkt. #98) is **GRANTED in part and DENIED in part** as follows:

    a. As to Count VI, the Motion is **GRANTED** and Count VI is dismissed.

    b. As to the remaining Counts, the Motion is **DENIED**.

(2) Plaintiffs' Motion for Summary Judgment and Supporting Memorandum of Law Against Consolidated Citrus Limited Partnership (Dkt. #101) is **DENIED**.

**DONE** and **ORDERED** in Fort Myers, Florida this 22nd day of July, 2013.

SHERI POLSTER CHAPPELL
UNITED STATES DISTRICT JUDGE

Copies:  All Parties of Record