UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FT. MYERS DIVISION

| | |
|---|---|
| GAUDENCIO GARCIA-CELESTINO, et al, individually and on behalf of all other persons similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>RUIZ HARVESTING, INC., BASILISO RUIZ and CONSOLIDATED CITRUS LIMITED PARTNERSHIP,<br><br>Defendants. | Case No. 2:10-cv-00542-MEA-DNF |

## CCLP'S POST-TRIAL MEMORANDUM OF LAW

Consolidated Citrus Limited Partnership ("CCLP" or "Defendant"), by and through its undersigned counsel and pursuant to this Court's post-trial briefing schedule, hereby submits its post-trial memorandum of law. Based upon the record evidence and applicable law, the trial evidence confirms that CCLP was not an "employer" of Plaintiffs or other members of the certified class for purposes of their asserted minimum wage and breach of contract claims. Accordingly, CCLP is entitled to judgment as to Plaintiffs' individual FLSA claims, and the Plaintiffs' class certified claims asserting breach of contract.

## BACKGROUND

CCLP is a citrus producer, with groves located throughout central and southwest Florida. Charlie Lucas is President of King Ranch, Florida, which as of the date of trial, manages CCLP's operations and which is CCLP's principal owner (Dkt. #206, 3-4). Although its acreage of cultivated citrus has declined dramatically in recent years (Dkt. #206, 14-15), most of CCLP's harvested fruit is sent to processing plants to be made into juice (Dkt. #206, 5). John Merritt leads CCLP's Production Department, which is responsible for cultivating CCLP's groves and

maximizing its yields (Dkt. #206, 54-55). CCLP's Harvesting Department is led by Area Harvesting Manager Gary Shelton, who is responsible for managing the process of getting CCLP's fruit harvested and delivered to the juice processing plants (Dkt. #206, 24). To accomplish this, Shelton was responsible for procuring the services of harvesting contractors sufficient to harvest CCLP's citrus crops. To do this, Shelton relied on fruit estimates his staff prepared annually on CCLP's citrus crops, estimating it would take 100 harvest workers to harvest a million boxes of oranges (Dkt. #210, 104-105). Shelton then contracted with multiple harvesting contractors to furnish services, based upon the number of harvesters they could employ and their available equipment and facilities (Dkt. #210, 105). Most of CCLP's outside harvesting contractors provided services to growers other than CCLP (Dkt. #210, 108-109).

CCLP gets its citrus harvested each season through the services of mechanical and hand harvest contractors (Dkt. #206, 22-24; #210, 62-63). During years relevant to Plaintiffs' asserted claims, Ruiz Harvesting, Inc. ("RHI") was one of the fifteen to thirty hand harvesting contractors utilized by CCLP (Dkt. #189, Sec. IX, ¶9). RHI is a company owned and operated by Basiliso Ruiz-Alcala ("Ruiz")(D.Ex.92, 5-6; Dkt. #210, 83).[1] In each of the 2007-2008 and 2008-2009 citrus harvest seasons, contractors and CCLP's in-house crews harvested a total of approximately 12 million boxes of citrus for CCLP (Dkt. #210, 63-64), with boxes defined as a ninety-pound weight of harvested oranges (Dkt. #206, 49). RHI initially employed H-2A workers in the 2006-2007 season, and did not find the program to be more expensive than operating as a domestic harvesting contractor (D.Ex.92, 30-31).

The scope of RHI's services to CCLP for the 2007-2008 and 2008-2009 citrus harvest seasons are memorialized in annual harvesting agreements ("Agreements") prepared by CCLP

---

[1] CCLP's trial exhibits are referenced herein as "D.Ex.__, __," followed by the appropriate numerical or paragraph designation. Plaintiffs' trial exhibits are referenced as "P.Ex.__,__."

Human Resources Director Michael Bartos (Dkt. #206, 88-89; Dkt. #189, Sec. IX, ¶5; D.Ex. 1 & 2). For the 2007-2008 and 2008-2009 citrus harvest seasons, RHI was authorized to employ 94 and 127 H-2A workers, respectively (Dkt. #189, Sec. IX, ¶¶10, 12), and it operated 3 to 4 separate harvesting crews (D.Ex.92, 25-26). CCLP monitored RHI's compliance with its contractual obligations through the work of Ismael Delgado, CCLP's Safety and Labor Compliance Manager (Dkt. #206, 89; Dkt. #207, 132-136), who prepared recordkeeping audits to verify RHI's compliance with its Agreements (D.Ex.7, 12, 13). For the 2007-2008 citrus harvest season, RHI paid Plaintiffs weekly by check (Dkt. #189, Sec. IX, ¶29). For the 2008-2009 citrus harvest season, RHI directed its payroll processing service to pay Plaintiffs weekly by direct deposit (Dkt. #208, 92; Dkt. #189, Sec. IX, ¶30). RHI's bookkeeper also prepared Plaintiffs' expenses reimbursements and RHI's tax filings (Dkt #208, 78-79, 82; D.Ex. 43-49).

Irrespective of how they were paid, after fully receiving their earnings for the week, Plaintiffs claim that they were at times asked to return build up pay which RHI added to their piece-rate earnings, when such earnings failed to average out to the required Adverse Effect Wage Rate ("AEWR") for hours worked. When they returned this supplemental pay, Plaintiffs further contend that such alleged "kickbacks" resulted in their failure to be paid the applicable federal minimum wage for their work. However, before filing suit against CCLP, no Plaintiff ever complained to CCLP about the alleged kickbacks (Dkt. #207, 154; Dkt. #162, dismissing Florida Minimum Wage Act claims for Plaintiffs' failure to provide CCLP the required pre-suit notice). Plaintiffs settled their claims with Ruiz and RHI prior to trial (Dkt. #160).

Beginning in the 2007-2008 citrus harvest season, CCLP itself entered the H-2A Program and thereafter directly employed a minimum of 63 in-house harvest workers, ultimately increasing that number to 264 in-house harvest workers per season as it invested in additional

equipment and constructed additional housing (Dkt. #206, 39-39; #207, 34). None of the Plaintiffs were in-house H-2A workers employed by CCLP (Dkt. #189, Sec. IX, ¶8).

CCLP is paid for its fruit based upon the measured pound solids of harvested fruit delivered to its processing plants (Dkt. #210, 26). To best manage its crop, CCLP's Harvesting Supervisors test the fruit repeatedly throughout the season (Dkt. #210, 24-27). CCLP seeks to maximize its pound solids within constraints such as its processing plants' operational schedules, trailer allocations given out to individual citrus producers by the processing plants, CCLP's harvesting capacity, weather conditions, fruit maturation and tree health (Dkt. 206, 45-47).

## MEMORANDUM OF LAW

### I. The trial evidence does not support Plaintiffs' individual claims that CCLP was their "joint employer" under the FLSA

Under the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. §§ 201 *et seq.*("FLSA"), the joint employment analysis seeks to ascertain whether, as a matter of economic reality, the individual employees are dependent upon the putative joint employer. In this case, there is no dispute that Plaintiffs were employed by Ruiz Harvesting ("RHI") (Dkt. #189, Sec. IX, ¶13). However, despite notable differences in how CCLP interacted with its in-house workers as compared to RHI's harvesters, Plaintiffs seek to impose FLSA liability on CCLP as their asserted joint employer.

In *Layton v. DHL Express (USA) Inc.*, 686 F.3d 1172 (11th Cir. 2012), the 11th Circuit embraced a template for courts to use in analyzing joint employment claims arising under the FLSA, when such claims do not involve plaintiffs covered by the Migrant and Seasonal Agricultural Worker Protection Act, 29 U.S.C. §§1801 *et seq.*("AWPA"). Here, all of the Plaintiffs are H-2A workers, who are specifically excluded from coverage under the AWPA. 29 U.S.C. §§ 1802 8(B)(ii) and (1)(B)(iii).

However, the *Layton* joint employment factors are only a template for determining economic dependence under the FLSA – "a template more useful in some cases than others." *Layton*, 686 F.3d at 1181. The *Layton* template can only be properly applied under the unique facts herein with full consideration of the immigration laws and detailed Department of Labor ("DOL") regulations which governed all aspects of RHI's employment of the Plaintiffs, and which generally prohibited the employment of such guestworkers by others. Plaintiffs were authorized to be in this country for one reason – to work for RHI for the temporary periods allowed by their H-2A visas. *Arriaga v. Florida Pacific Farms, L.L.C.*, 305 F.3d 1228, 1233 n.2 (11th Cir. 2002)("The H-2A worker is only admitted into the United States to work for the designated employer…"). In the context of the H-2A program and its regulations, application of *Layton's* joint employment factors to the trial evidence results in the inevitable conclusion that the Plaintiffs were not as a matter of economic reality dependent upon CCLP.

### a. The nature and degree of CCLP's control of Plaintiff's employment

In seeking its temporary labor certifications for the relevant seasons that Plaintiffs were employed, RHI established to the satisfaction of the Department of Labor that it would have an employer-employee relationship with the H-2A workers it sought to employ (*e.g.*, D.Ex.14, at Bates #00418); 20 C.F.R. § 653.104(c)(2007). The Department of Labor certified Ruiz Harvesting's applications for the 2007-2008 and 2008-2009 seasons, which listed "Ruiz Harvesting" as the *sole* employer (D.Ex.18 & 36).

Once it established the written terms of its employment offers by enlisting the services of the Florida Fruit & Vegetable Association ("FFVA") for its filings (D.Ex.92, 41-42, 101-103), RHI independently decided what country from which to recruit its foreign laborers, what regions of the foreign country to conduct recruiting to obtain productive workers, and ultimately hired personnel in Mexico and the United States to help Plaintiffs obtain their visas (Dkt. #s 189, Sec.

IX, ¶37 and 208, 60-62; D.Ex.92, 11-12). Once Plaintiffs received their visas, RHI transported the Plaintiffs to Florida, provided Plaintiffs with initial training (Dkt. #208, 32; D.Ex.92, 91-92), provided ladders, picking sacks and tubs for Plaintiffs to use to accomplish their work, furnished field sanitation facilities, drinking water and hand washing stations, and provided Plaintiffs daily transportation to and from the groves and Plaintiffs' temporary living quarters, which it owned or leased (D.Ex. 92, 16-17, 21, 23). After arriving in Florida, RHI handled reimbursements of Plaintiffs' pre-employment expenses and paid outbound transportation at the end of the season, through its payroll processing company (D.Ex. 92, 52, 85-87; Dkt.#208, 64-65).

The Eleventh Circuit has emphasized that the "control" factor arises in the agricultural labor context when the alleged employer "goes beyond general instructions, such as how many acres to pick in a day, and begins to assign specific tasks, to assign specific workers, or to take an overly active role in the oversight of the work." *Martinez-Mendoza v. Champion International Corporation*, 340 F.3d 1200, 1209 (11th Cir. 2003), *citing Aimable v. Long & Scott Farms*, 20 F.3d 434 at 441(11th Cir. 1994).

> An alleged employer takes an 'overly active' role when it decides such things as (1) for whom and how many employees to hire; (2) how to design the employees' management structure; (3) when work begins each day; (4) when the laborers shall start and stop their work throughout the day; and (5) whether a laborer should be disciplined or retained.

*Martinez-Mendoza*, 340 F.3d at 1209-10, citing *Charles v. Burton*, 169 F.3d 1322, 1329 (11th Cir. 1999). The trial evidence establishes that CCLP did not do, nor did it participate in any of these things with respect to the Plaintiffs. All of these matters - among other employment-related decisions such as whether to even participate in the H-2A Program- were decided and communicated to Plaintiffs by Ruiz himself, or by one of RHI's crew leaders (Dkt. #207, 118; #208, 34-35; #189, Sec. IX, ¶ 42).

RHI exclusively determined who it would contract with to provide harvesting services (electing to limit its services to CCLP), how many workers it would need to hire each season, how it would train its workers, and how carefully – if at all - to manage and supervise its harvest workforce's productivity in the groves (D.Ex.92, 15). RHI determined how many H-2A workers to employ based upon the number of licensed crew leaders it employed, its available housing facilities and the equipment which it needed to perform the scope of its harvesting work, such as buses to transport its harvest workforce, forklifts, tubs, picking sacks, ladders and portable rest rooms (Dkt. #210, 105). Plaintiffs acknowledge that RHI solely supervised their harvest work in the groves, through Basiliso Ruiz himself, and RHI's crew leaders, such as Seraphin Ruiz, Rogelio Ruiz, Leonel Sanchez and Pedro Garcia who drove the buses and operated RHI's forklifts in the groves (Dkt. #207, 92-93; #208, 33; Dkt. #55-20, 9; Dkt. #55-14, 44; Dkt.#98-9, 8; Dkt. #55-17, 55; Dkt. #98-3,74; D.Ex.92, 8-10).

While CCLP Harvesting Supervisors had the authority to stop unauthorized equipment or vehicles with insurance lapses from entering its grove properties (Dkt. #209, 25), no stop work instructions were ever given to RHI's crews in the 2007-2008 or 2008-2009 seasons (Dkt. #209, 87; #211, 153). CCLP's only "control" of RHI's crews was limited to determining the blocks within its groves in which RHI would harvest ripe fruit (Dkt. #189, Sec. IX, ¶ 40-41), and how many fruit trailers RHI could fill with harvested fruit from the trailer limitations dictated by CCLP's processing plants (Dkt. #210, 51-53). Such agricultural decisions are not the types of "control" that support a finding of joint employment. *Aimable*, 20 F.3d at 441.

### b. CCLP did not meaningfully supervise Plaintiffs' work

CCLP's Harvesting Supervisors' responsibilities with respect to the harvesting crews of RHI were to act as quality assurance monitors to verify that RHI was performing its services in compliance with the terms of its Agreements, to furnish RHI's crew leaders daily with copies of

each crew's scanned hours for the prior workday (Dkt. #209, 18-20), and to complete trip tickets on fruit trailers to ensure that the fruit was timely hauled to the processing plants with RHI being credited with the proper quantity of fruit produced from the efforts of its harvesting personnel (Dkt. #209, 4-5; #211, 132-133).

As for supervision of the work, CCLP had only minimal oversight to ensure that RHI was harvesting in the designated blocks and complying with the general terms of its Agreements. CCLP's Harvesting Supervisors had multiple responsibilities throughout their workday, including inspecting the activities of numerous other outside harvesting contractors, preparing daily reports for and supervising the work of CCLP's in-house H-2A crews, preparing trip tickets and coordinating hauling contractors to get the harvested fruit from all crews to the processing plant in a timely fashion, and fruit testing. Indeed, in a typical 8½ to 9½ hour workday, CCLP's Harvesting Supervisors would interact with one of RHI's harvesting crews for no more than a cumulative total of 90 minutes (Dkt. #209, 107-109; #211, 134-136).

While CCLP's Harvesting Supervisors and Safety Compliance Manager interacted directly and regularly with CCLP's in-house harvesters and crew foremen (Dkt. #207, 159-163; #208, 100-103; #211, 145-152), their interactions with RHI was limited to communications with RHI's equipment operators (Dkt.#210, 76-78; Dkt. #207, 164; #211, 146-147) and providing daily sheets of their scanned "in and out" times (e.g., D.Ex. 51; Dkt. #211, 143-144). Not surprisingly, therefore, no Plaintiffs even know who CCLP is, nor did they ever identify a single CCLP employee to be one of their supervisors (Dkt. #208, 39; #98-10, 41-42; #98-12, 37; #98-7, 41; #98-8, 37; #55-18, 28; #55-16, 60).

### c. CCLP exercised no right to hire, fire or modify Plaintiff's employment conditions

Through its job clearance orders (P.Ex. 1 & 2) and Agreements (D.Ex. 1 & 2, ¶3), RHI had the exclusive authority to hire and fire the Plaintiffs. Unlike the putative joint employer in *Aimable*, CCLP did not countermand any of RHI's hiring decisions, dictate the hours that Plaintiffs' worked, decide when the work day would begin or end, nor force workers to stop harvesting when market prices were bad. Although CCLP reserved the authority to deny RHI access to its groves (D.Ex. 1 & 2, ¶ 25.3 and attached Citrus Canker Procedures), CCLP did not exercise any such authority with respect to RHI's services during the citrus harvest seasons at issue in this litigation (Dkt. #209, 25, 87; #210, 85; #211, 153, 176). Had it done so, RHI was free under its Agreement with CCLP to pack up its labor and equipment and provide harvesting services to any other citrus producer (D.Ex. 1 & 2, ¶7).

RHI maintained exclusive control over how Plaintiffs were trained to work safely and to be productive harvesters, which crew leader to assign each Plaintiff to work under, when to begin and stop work each day, and when to allow Plaintiffs to take rest breaks and meal breaks while harvesting in the groves. All such decisions were up to RHI, and RHI's decisions directly impacted the Plaintiffs' productivity and weekly earnings.

### d. CCLP did not set Plaintiffs' pay rates of pay methods

While it had the freedom to compensate Plaintiffs in any way that was in compliance with applicable law (Dkt. #210, 76; D.Ex. 1 & 2, ¶27.1), RHI elected to pay the Plaintiffs a piece-rate for their work harvesting citrus, with a guaranteed minimum of the AEWR for all hours worked (P.Ex.1, ¶11(b) at 00374; P.Ex.2, ¶11(b) at 00507; Dkt. #208, 45-46). Plaintiffs' earnings each workweek were determined by their piece-rate production, the rates for such piece-

unit work as determined by RHI, and in certain weeks of relatively low piece-rate earnings, additional pay for their hours worked.

Plaintiffs contend that CCLP effectively set their "pick rates" for harvesting, but the evidence does not support their claim. Before Plaintiffs ever arrived to Florida to commence work, RHI's job clearance orders established the *minimum* piece-rates it would pay Plaintiffs for their harvesting work based upon the variety of fruit Plaintiffs would harvest (P.Ex. 1 & 2, ¶11(a)). Such guaranteed piece-rates were far higher than the assumed hypothetical base rate of $0.70/box as noted in RHI's Agreements with CCLP (D.Ex.1 & 2, Att. A). RHI's job clearance orders also established the applicable AEWR which RHI agreed to guarantee Plaintiffs for their work (P.Ex. 1 & 2, ¶11(b)). While CCLP's Pick and Roadside charts ("Roadside Matrices") contained a hypothetical pick rate with a formula for increasing the corresponding roadside, such charts did not set RHI's pick rate to pay Plaintiffs, as RHI could pay its harvesters using varying rates or by an hourly wage (Dkt. #210, 75-76, 88). CCLP's Harvesting Supervisors used Roadside Matrices to facilitate the accurate recording of the agreed Roadside Rates for RHI's harvesting services on trip tickets (Dkt. #210, 37-39).

As for tracking hours worked by Plaintiffs and following an effective time-keeping system which had been in use at CCLP at a time when all harvesting was performed by outside contractors, the scanned "in and out" times representing Plaintiffs' presence on CCLP grove properties were captured on CCLP equipment, and reported by CCLP to RHI per the terms of its annual Agreements (D.Ex. 1 & 2, ¶3; Dkt. #206, 78-80; #207, 60-61). To facilitate the exchange of scanned data, CCLP created identification badges for RHI's H-2A workers, which contained the worker's photograph and name, and a computer generated bar code which identified each Plaintiff as an RHI employee (Dkt. #207, 58-59). Identification badges made for CCLP's in-

house H-2A workers were similar, but conspicuously identified its harvesters as employees of "CCLP" (Dkt. #207, 59). In the 2007-2008 citrus harvest season, Plaintiffs scanned themselves in and out of the grove, swiping their RHI identification badges into CCLP's card reader (Dkt. #206, 78). At some point during the 2008-2009 citrus harvest season, technology improved to allow the use of a battery charged portable wand to capture "in and out" scans of Plaintiffs' identification badges, and the card readers were no longer used (Dkt. #207, 59).

While CCLP captured scanned data and sent to RHI's payroll processing company each week (*see, e.g.*, D.Ex. 8), RHI's payroll processing company chose to use the adjusted "hours worked" totals for purposes of computing the "hours worked" by Plaintiffs each workweek (Dkt. 208, 47-48, 78). Such adjusted hours deducted an estimated amount of time for intra-grove travel, and when applicable, for a bona fide meal break (Dkt. #206, 81-85). RHI's bookkeeper's payroll software was not set up to compute total hours worked based upon scanned in and out times, so it used the daily total hours figures to determine "hours worked" as adjusted by CCLP's software (Dkt. #208, 47-48, 78).

Thus, well before the Plaintiffs received their H-2A visas and prior to the Plaintiffs ever arriving in the United States, RHI already had established through its job clearance orders the minimum piece-rates and hourly rate guarantees that it would pay to Plaintiffs for their temporary employment in Florida. CCLP had nothing to do with establishing RHI's minimum piece-rates or the applicable AEWR.[2]

---

[2] Piece-rates are listed in the job clearance orders by the tub, with RHI's tubs being the equivalent of ten (10) boxes of harvested fruit, as per Section 20-2.0032(2)(b), *Florida Administrative Code*. (P.Ex. 1 & 2, ¶11(a)). Testimony regarding piece-rate units varies on the record evidence in this case, as most deponents refer to piece-rates paid by the standard field box of ninety (90) pounds of harvested oranges (*e.g.,* Dkt. #206, 49), while others refer to the piece-rates paid as a tub rate (*e.g.*, P.Ex. D1, 69 "…always from $10 on up"). The payroll records of RHI identify applicable piece-rates as being paid by the field box (D.Ex. 6,10; Dkt. #208, 45-46).

RHI paid Plaintiffs at designated piece-rates,[3] based upon the boxes of fruit they were credited with harvesting by their assigned crew leader (Dkt. #206, 99-100, 123). Once loaded into fruit trailers, RHI's crew leaders completed field tickets and attached them to the fruit trailers, indicating the date of the harvest, the block or area of the grove where the harvested fruit came from, the RHI crew which completed the harvest services, and the number of field boxes loaded on to the trailer (Dkt. #209, 89-91).

In contrast, CCLP paid RHI for its services at varying Total Pick and Roadside rates per field box ("Roadside Rates"), *based upon the total weight of the fruit as determined by the processing plants* (D.Ex. 1 & 2, Att. A; Dkt. #210, 73). CCLP Harvesting Supervisors used the box counts and other data from the field tickets created by RHI's crew leaders to complete trip tickets, designating the Roadside Rates which CCLP had agreed to pay RHI (Dkt. #210, 86; #209, 54-56). Following each workday in the groves, CCLP's Harvesting supervisors gave RHI's crew leaders a duplicate copy of the completed trip tickets to provide written confirmation of the agreed Roadside Rates which CCLP had agreed to pay (Dkt. #209, 18-20), but neither the trip tickets nor scanned hours reports furnished to RHI (e.g., D.Ex. 8) set a "pick rate" for Plaintiffs (Dkt. #209, 92-94; #210, 74-75; #211, 175). RHI exclusively determined the piece-rates to pay the Plaintiffs, using the total box count its crew leaders made in the groves each day, and RHI then furnished this piece-rate information to its payroll processing company in order to complete Plaintiffs' payroll (Dkt. #208, 45-46).

The Agreements between CCLP and RHI (specifically, D.Ex. 1 & 2, ¶27.1), allowed RHI the latitude to pay its harvest workers in whatever manner it chose, provided the manner of compensation met applicable legal standards (Dkt. #210, 76). Indeed, RHI attested each week in

---

[3] 20 C.F.R. § 655.102(b)(9)(ii)(A)(2007).

the presence of its bookkeeper to having properly paid its harvest workers in compliance with applicable law, as a condition of receiving payment for its services from CCLP (Dkt. #208, 95).

RHI determined not only the piece-rates it would pay the Plaintiffs, but also the piece or hourly rates it would pay its other employees, such as equipment operators (Defendant Ex. 92, p.4). RHI exercised the sole discretion of whether to pay its H-2A workers the hypothetical "pick rates" which corresponded to the Roadside Rates paid by CCLP (Dkt. #211, p. 175), some other piece-rate (Dkt. #210, p. 86), or to simply pay its harvest workers an hourly wage – which some outside harvesting companies had done in the past (Dkt. #210, 76).

RHI had considerable discretion to set the piece-rates it paid to Plaintiffs from the Roadside Rates it received from CCLP. Most notably, RHI realized a weight gain or surplus from its harvesting services to CCLP for the seasons at issue, compared to the number of field boxes its crew leaders recorded to pay its piece-rate paid employees (D.Ex. 5). In the 2007-2008 citrus harvest season with an average Roadside Rate paid of $2.03 per box, RHI's weight gain totaled 99,537.33 boxes, for a surplus of $201,687.75 paid by CCLP to RHI over the number of boxes reflected in RHI's field tickets for that season (D.Ex. 5; Dkt. #211, 13). In the 2008-2009 citrus harvest season with an average Roadside Rate of $2.08 per box, the weight gain totaled 67,260.18 boxes, for a surplus of $139,901.17 paid by CCLP to RHI over the number of boxes reflected in the field tickets for that season (D.Ex. 5; Dkt. #211, 13).

RHI's complete discretion on what to offer, and how to compensate Plaintiffs after Plaintiffs commenced their harvesting activities does not support the contention that Plaintiffs were economically dependent upon CCLP.

### e. RHI provided all equipment used by Plaintiffs in performing their work

*Layton's* final joint employment factor encourages the court to analyze the comparative levels of investment in equipment and facilities between RHI and CCLP, from the perspective of

the Plaintiffs in this case. *Layton*, 686 F.3d at 1180. RHI had significant investment in its equipment and facilities used in effectuating Plaintiffs' employment.

Nearly all equipment and facilities relied upon by RHI to operate as a harvesting contractor were owned or provided to Plaintiffs by RHI itself. RHI owned or leased the housing facilities where it provided living quarters to Plaintiffs (D.Ex. 25, 32), and maintained required licenses and insurance to operate as a farm labor contractor using the H-2A Program (D.Ex. 24, 35, 32). RHI provided the buses on which Plaintiffs rode to and from work each day, the tubs in which Plaintiffs deposited harvested citrus, and the hydraulic lifts or "goats" which picked up the loaded tubs of fruit and dumped the fruit into the trailers (D.Ex. 92, 62-63), and employed drivers of the buses who were authorized to transport workers (D.Ex. 35). Once the Plaintiffs arrived in the groves to harvest fruit, RHI provided the Plaintiffs with portable rest room facilities, drinking water, and the ladders, tubs and pick sacks used in carrying out their harvesting work (D.Ex. 92, 66). RHI provided Plaintiffs with workers compensation insurance coverage, and hired its own payroll processing company to pay the Plaintiffs for their work through check or direct deposit, to issue W-2s and 1099 forms, and to deposit appropriate taxes (Dkt. #s 208, 92-94; D.Ex. 92, 38-39, 52, 80).

Although CCLP owned the land where Plaintiffs worked and used its scanning equipment to electronically capture "in and out" data as RHI's harvesters entered and exited the groves, most all of the equipment and facilities vital to Plaintiffs' harvesting work was furnished by RHI. RHI's investment in equipment enabled it to take its equipment and labor and harvest elsewhere.

For the reasons articulated above, CCLP respectfully submits that as a matter of economic reality, the Plaintiffs were not dependent upon CCLP. As such, CCLP is therefore entitled to judgment as to the remaining Plaintiffs' FLSA claims in this litigation.

## II. CCLP is not liable for RHI's asserted Contractual Violations

Plaintiffs contend that using the FLSA's "suffer or permit" to work formulation, CCLP should be legally responsible for RHI's asserted contract violations to fully reimburse pre-employment expenses. As noted above, the trial evidence does not support this claim. Neither does the applicable law, as for the reasons cited above, CCLP did not seek to or actually control the Plaintiffs and Class Members' terms and conditions of employment.

For those reasons articulated in its prior filing (*e.g.*, Dkt. #172, Part III), this Court should decline to adopt Plaintiffs' suggested legal standard for analyzing "employer" status under the H-2A Program, as such a "suffer or permit" to work standard is inconsistent with the text of the federal statute, relevant federal regulations, and is contrary to the holdings of *Nationwide Mutual Ins. Co. v. Darden*, 503 U.S. 318, 112 C. Ct. 1344, 117 L. Ed. 2d. 581 (1992) and its progeny.

Here, the Class Members' sole "employer" was RHI. Through its job clearance orders, RHI identified itself to the Department of Labor as the Class Members' only employer, and instructed those interested in pursuing RHI's job offers to contact Ruiz to obtain employment (P.Ex.1 & 2, ¶5). RHI's required local newspaper advertisements identified "Ruiz Harvesting" as the sole employer (D.Ex. 15, 29). CCLP had nothing to do with preparing RHI's applications for temporary labor certification, and did not hire, fire, pay, supervise or otherwise control the terms and conditions of the Class Members' employment in any significant way. By definition, therefore, CCLP is not an "employer" of the Class Members,[4] and consequentially is not liable for RHI's alleged material breaches of its clearance orders.

---

[4] 20 C.F.R. § 655.100(b)(2008).

        Respectfully submitted,

        */s/ David J. Stefany*
        DAVID J. STEFANY
        Florida Bar No. 0438995
        SHAINA THORPE
        Florida Bar No. 0055464
        *Counsel for Defendant*

        **ALLEN, NORTON & BLUE, P.A.**
        Hyde Park Plaza - Suite 225
        324 South Hyde Park Avenue
        Tampa, Florida 33606-4127
        (813) 251-1210
        (813) 253-2006 – Fax
        E-Mail: dstefany@anblaw.com
        E-Mail: sthorpe@anblaw.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 21, 2014, I sent a true and correct copy of the foregoing by electronic mail to Gregory S. Schell, Esquire and Victoria Mesa, Esquire at Florida Legal Services, Inc., Migrant Farmworker Justice Project, 508 Lucerne Avenue, Lake Worth, Florida 33460-3819.

        */s/ David J. Stefany*
        ATTORNEY