## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## FORT MYERS DIVISION

| | | |
|---|---|---|
| GAUDENCIO GARCIA-CELESTINO, | ) | |
| *et al.,* individually and on behalf of all other | ) | |
| persons similarly situated, | ) | |
| | ) | |
| Plaintiffs, | ) | 2:10 C 542 – MEA – DNF |
| | ) | Hon. Marvin E. Aspen |
| v. | ) | |
| | ) | |
| CONSOLIDATED CITRUS LIMITED | ) | |
| PARTNERSHIP, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

MARVIN E. ASPEN, District Court Judge:

Plaintiffs represent a certified class of temporary H-2A Mexican guestworkers who

picked citrus fruit on groves owned by Defendant Consolidated Citrus Limited Partnership

("CCLP") during either the 2007–2008 or 2008–2009 harvest seasons.  Former Defendant Ruiz

Harvesting, Inc. ("RHI") is a farm labor contractor, which hired and furnished Plaintiffs to pick

fruit for CCLP.  Plaintiffs allege that RHI violated both its employment contracts with the

harvesters[1] and minimum wage requirements under the Fair Labor Standards Act ("FLSA").[2]

---

[1] Pursuant to 20 C.F.R. § 655.102(b)(14) (2008), RHI's job clearance orders for the two relevant seasons constituted employment contracts between RHI and the harvesters, governing the terms and conditions of their employment.  (Dkt. No. 189 (Am. PTO) at 28–29 (Stipulations of Law, Nos. 12–13).)

[2] Plaintiffs initially brought class claims (Count VI) under the minimum wage provisions of the Florida Constitution.  Judge Chappell previously granted summary judgment in favor of CCLP on those claims. *Garcia-Celestino v. Ruiz Harvesting, Inc.,* 10 C 542, 2013 WL 3816730, at *15–17 (M.D. Fla. July 22, 2013).  Plaintiffs also settled the claims asserted in Counts I through III of the amended complaint.  Accordingly, only the individual FLSA claims (Count IV) and the class breach of contract claims (Count V) were tried. *Id.* at *4–5.  As we understand Plaintiffs' theories, the FLSA claims stem from the failure to sufficiently reimburse the guestworkers for pre-employment expenses.

Plaintiffs contend that RHI and CCLP were their joint employers and, thus, that both are liable for RHI's unlawful conduct.  CCLP is the only remaining defendant.

A six-day bench trial addressing CCLP's liability as an alleged joint employer during these two harvest seasons was held in February 2014.  The parties have since submitted their post-hearing briefs, as well as their proposed findings of fact and conclusions of law.  For the reasons set forth below, we find that CCLP is liable to Plaintiffs as their joint employer.

As a result, we find in favor of Plaintiffs on their H-2A contractual claims.  As for the remaining claims, and as detailed below, we order: (1) additional briefing on the FLSA claims; and (2) discovery on the gate deduction claims.  An evidentiary hearing on the gate deduction claims is hereby scheduled for January 11, 2016.

## FINDINGS OF FACT

Pursuant to Federal Rule of Civil Procedure 52(a)(2), we begin with a recitation of the facts pertinent to our analysis.  Fed. R. Civ. P. 52(a)(2).  We primarily rely on the parties' Stipulation of Facts (*see* Dkt. No. 189 (Am. PTO) at 20–28 (Stipulations of Fact)),[3] the transcripts of trial testimony,[4] the parties' exhibits (including depositions admitted at trial), and, where necessary, our assessment of witness credibility.  We also consider the parties' pre- and post-hearing briefs (including supplemental materials) and proposed findings and conclusions, and we bear in mind our prior evidentiary rulings.  (*See* Dkt. No. 191 (resolving motion in limine and bifurcating discovery and trial on the gate deduction claim).)  In large part, the critical facts are undisputed.

---

[3] We will not consider Stipulation No. 6, which we allowed CCLP to withdraw at trial. (2/12/14 Tr. at 56–57.)

[4] The transcripts of witness trial testimony appear on the docket as documents 206 through 211, and 215.

### A.    CCLP's Citrus Operations

CCLP grows citrus fruit, including various types of oranges.  (*See* Stip. Nos. 1–2; 2/12/14 Tr. (Lucas) at 5–7.)  CCLP has numerous groves in Florida, although it has lost a significant number of groves in the last ten years or so.  (2/12/14 Tr. (Lucas) at 14–21 (noting a loss of half of their total acres).)  CCLP sold some of the groves but lost others due to serious citrus diseases, such as greening and citrus canker.  (*Id.*)

Primarily, CCLP sells its fruit to be processed into juice by other companies, such as Tropicana.  (*See* Stip. No. 2; 2/12/14 Tr. (Lucas) at 5–7 (explaining that 90% of CCLP's fruit is juice oranges).)  Under its contracts with the processors, CCLP must produce and deliver a certain quantity, and quality, of fruit.  (2/12/14 Tr. (Lucas) at 7–9.)  The processors pay CCLP for the oranges based on "pound solids," a figure that accounts for both the weight of the fruit delivered as well as its sweetness.[5]  (*Id.* at 9–11.)  The juice processors create a schedule for operation of their plants, and they allocate time for each grower's production.  (*Id.* at 11; *see id.* at 47 (testifying that the processors dictate when the plant runs and how many loads they will accept).)  Based on the parameters set by the processors, CCLP plans its harvesting schedule, seeking to maximize its pound solids.  (*Id.* at 11–12, 47.)  At times, CCLP may need to cease harvesting due to weather or the processor's inability to accept more fruit that day for any reason, including a problem at the plant.  (*Id.* at 13.)  Generally speaking, the processing and harvesting season runs from late November through the end of May or early June.  (*Id.* at 8; 2/12/14 Tr. (Bartos) at 65; *see also* 2/19/14 Tr. (Shelton) at 51–52.)

---

[5] The sweetness of the oranges, or the level of fructose, is often called the "brix content" or "brix."  (2/12/14 Tr. (Lucas) at 10–11; 2/18/14 Tr. (Reyes) at 33–34.)

### B.    The Move to H-2A Labor

As the parties agree, "harvesting [is] an integral part of CCLP's business of producing citrus fruit for processing into juice."  (Stip. No. 2; 2/12/14 Tr. (Lucas) at 23.)  During the 2005–2006 season, however, CCLP was nearly unable to harvest all of its fruit due to a labor shortage. As a result, and beginning with the 2006–2007 harvesting season, CCLP contracted with its labor contractors, including RHI, to obtain more reliable labor from guestworkers through the H-2A visa program.  (2/12/14 Tr. (Lucas) at 24–26; 2/12/14 Tr. (Bartos) at 91–93; Stip. No. 7.)

The parties dispute whether CCLP required that its labor contractors recruit labor through the H-2A program.  CCLP representatives generally testified that contractors were not required to recruit H-2A labor to harvest the orange crop.  (*See* 2/12/14 Tr. (Lucas) at 27–30, 56–57; 2/12/14 Tr. (Bartos) at 91–93.)  Charles Lucas and Michael Bartos[6] testified at trial that the contractors approached CCLP with the idea and/or that they mutually agreed to pursue the H-2A option to find sufficient labor.  (*See* 2/12/14 Tr. (Lucas) at 26–27; 2/12/14 Tr. (Bartos) at 91–93.) Bartos elaborated, however, further testifying that if the core contractors, including RHI, wanted to continue working with CCLP in the future, they would need to participate in the H-2A program.  (2/13/14 Tr. (Bartos) at 30–33.)  Gary Shelton, CCLP's Area Harvesting Manager for Florida, testified that the contractors "were already planning on going to work in the H-2A program" and that CCLP "didn't force anybody."  (2/19/14 Tr. (Shelton) at 108–10 (noting that "domestic labor had dried up").)  For their part, Plaintiffs point to the deposition testimony of RHI's owner, Basiliso Ruiz.  Ruiz testified that CCLP said that H-2A is "the way we'll be working."  (CCLP Tr. Ex. 92 (Ruiz 6/2/11 Dep., Dkt. No. 101–13) at 27; *see also id.* at 31.)  Yet

---

[6] Charles Lucas is the President/CEO of King Ranch, which manages CCLP.  (2/12/14 Tr. (Lucas) at 3–4.)  Michael Bartos is King Ranch's Director of Human Resources.  (2/12/14 Tr. (Bartos) at 63–64.)

4

Ruiz also stated that RHI entered the H-2A program voluntarily, because it would be easier for him to find workers.  (*Id.* at 28–31 (testifying that the H-2A program was "better for [him]," even though it was more costly).)

Having considered the witness' deposition and trial testimony, we find that CCLP ultimately decided to continue working with core contractors, including RHI, *only* if they chose to participate in the H-2A program.  Lucas and Bartos both wavered at times on the question of whether CCLP mandated participation.[7]  While Shelton's testimony was consistent with CCLP's trial position, he acknowledged that Bartos would be more familiar with the issue.  (2/19/14 Tr. (Shelton) at 110.)  And Bartos testified, both in his deposition and when pressed at trial, that entering the H-2A program was a condition for working with CCLP.  (2/13/14 Tr. (Bartos) at 32–33.)  Nonetheless, the testimony leads us to the overall conclusion that the shortage of reliable labor in the market led growers and contractors alike to pursue the H-2A program.  (*See, e.g.*, Stip. No. 7.)  When placed in this broader context, even the inconsistencies in the witness' testimony make sense.  Thus, for example, Ruiz's testimony that he entered the H-2A program "voluntarily"—although CCLP also indicated he must do so to work with it—reflects the reality that both RHI and CCLP needed labor for their respective businesses, and no steady domestic labor could be found.[8]

In addition to hiring contractors to obtain guestworkers, CCLP began directly hiring and employing H-2A workers, beginning with the 2007–2008 harvest.  (Stip. No. 8; 2/12/14 Tr. (Lucas) at 38–41.)  CCLP recruits approximately 260 H-2A workers directly.  (2/12/14 Tr.

---

[7] At his deposition, Lucas stated that participating in the H-2A program was a condition of working with CCLP.  He backtracked from this position at trial.  (2/12/14 Tr. (Lucas) at 27–29, 59–62.)

[8] In any event, we agree with Judge Chappell's reasoning at the summary judgment stage that CCLP's reliance on the H-2A program has "little bearing" on its liability.  *Garcia-Celestino*, 2013 WL 3816730, at *7.

(Lucas) at 39–41.)  CCLP, like other direct employers, must provide housing for any H-2A

workers.  (*Id.*)  As a result, CCLP is limited in the number of harvesters it can hire without

expending added capital on human resources personnel and housing units.  (*Id.*)  Despite the

added costs, CCLP, like RHI, considers it worthwhile to participate in the H-2A program to

ensure the fruit is picked in time for processing.  (*Id.* at 41; Ruiz 6/2/11 Dep. at 28–31.)

### C.    *Recruiting H-2A Guestworkers*

Prior to hiring guestworkers, a registered farm labor contractor such as RHI must obtain

state and federal certification consistent with the H-2A temporary agricultural program.  (*See,*

*e.g.*, CCLP Tr. Exs. 24–39 (documents demonstrating the certification process for the 2008–09

harvesting season).)  During the relevant time period, RHI relied on the Florida Fruit and

Vegetable Association ("FFVA") for assistance with the certification process.  (Ruiz 6/2/11 Dep.

at 41–43; *see also* 2/14/14 Tr. (Celaya) at 70–73.)

RHI recruited guestworkers by placing ads on Mexican radio stations and by relying on

word-of-mouth.  (Ruiz 6/2/11 Dep. at 43–45.)  As described both by Ruiz and Plaintiffs, after

potential workers were identified from their communities, they sent Ruiz a copy of their passport

and then traveled to Monterrey, Mexico upon his instruction.[9]  (*Id.* at 43–50; 2/13/14 Tr.

(P. Camacho Garcia) at 82–88; 2/14/14 Tr. (P. Guerrero Fabian) at 18–20, 24–29.)  Typically,

the guestworkers traveled by bus to Monterrey, where they went to the Hotel Mexicano.  There,

---

[9] We have closely reviewed the deposition testimony of nineteen guestworkers in the class who
did not testify at trial.  (*See* CCLP Tr. Exs. 93–94, 96–110, 112–13 & Pls. Tr. Exs. A–H
[hereinafter *Guestworker Dep. Testimony*].)  While we decline to cite these numerous
depositions specifically, we find the testimony of the guestworkers to be credible and reliable.
The guestworkers consistently reported very similar details about their recruitment and
transportation to Florida, their work in CCLP's groves, and the alleged violations underlying this
action.  Their testimony further corroborates the testimony of the three guestworkers who
testified in person at trial.  We consolidate the deposition testimony for present purposes but
without minimizing its value.

they met Rene Flores, RHI's agent and an attorney, who would help them complete the

necessary paperwork to obtain a visa.  (Ruiz 6/2/11 Dep. at 46–51; 2/13/14 Tr. (P. Camacho

Garcia) at 82–88; 2/14/14 Tr. (P. Guerrero Fabian) at 19–20; *see also* Stip. No. 37; 2/14/14 Tr.

(Celaya) at 60–62.)  Yolanda Celaya, whose company performed bookkeeping and payroll

services for RHI, coordinated with Flores to arrange appointments at the U.S. Consulate in

Monterrey for Plaintiffs.[10]  (2/14/14 Tr. (Celaya) at 43–44, 60–62; Ruiz 6/2/11 Dep. at 47–48.)

The guestworkers stayed at the Hotel Mexicano for several days while this process unfolded.

(2/14/14 Tr. (P. Guerrero Fabian) at 28; Guestworker Dep. Testimony (stating that they waited in

Monterrey for visas anywhere from 3 to 15 days).)

       Once they had obtained visas, Plaintiffs boarded buses arranged by Flores for the trip to

Laredo, Texas, and on to Florida.  (Ruiz 6/2/11 Dep. at 50–51; 2/13/14 Tr. (P. Camacho Garcia)

at 89–90; 2/14/14 Tr. (P. Guerrero Fabian) at 28–30; Guestworker Dep. Testimony.)  Upon their

arrival in Florida, Ruiz picked up the workers and transported them to their housing sites.

(Ruiz 6/2/11 Dep. at 51.)  It is undisputed that RHI provided the housing for the harvesters it

recruited.  (2/14/14 Tr. (P. Guerrero Fabian) at 33; Guestworker Dep. Testimony (testifying as to

their housing arrangements and, for some, that they also paid Ruiz's wife weekly for food).)

       The parties dispute whether RHI sufficiently reimbursed the guestworkers for their travel

expenses, as required by law, but there is no question that each worker incurred significant costs

associated with his visa application, as well as his travel to and from Florida.  For example, the

workers paid a visa application fee (either $100 or $131) and a $6 fee to cross the border into the

United States.  (Stip. Nos. 35–36.)  They paid for transportation from their hometowns to

Monterrey (and back, after the harvest), and they paid Flores $280 for his services, including fees

---

[10] Celaya testified that RHI paid her for her services and that she used RHI's credit card to pay
the consular appointment fees for the workers.  (2/14/14 Tr. (Celaya) at 86–87.)

for the bus to Florida.  (Pls. Tr. Ex. 12 (Hotel Mexicano/Flores Receipt); 2/13/14 Tr.

(P. Camacho Garcia) at 83–90, 113–14; 2/14/14 Tr. (P. Guerrero Fabian) at 19–20, 25–31;

Guestworker Dep. Testimony.)  Some workers testified that Ruiz demanded other sums from

them, and others noted that they paid for food along the way as well.  (Guestworker Dep.

Testimony; *see also* 2/18/14 PM Tr. (R. Ismael Estrada) at 5–6, 11–13.)

Ruiz testified that, once the workers settled into their camps, he held a group meeting to

ask for receipts for travel reimbursement.  (Ruiz 6/2/11 Dep. at 52.)  A number of the

guestworkers testified that, at this initial meeting, Ruiz (or another RHI representative) instructed

the harvesters that if they did not pick enough fruit to meet the minimum wage, they would have

to go home and/or return any extra wages on their paychecks to RHI.  (2/14/14 Tr. (P. Guerrero

Fabian) at 9–10, 15, 23; 2/18/14 PM Tr. (R. Ismael Estrada) at 3; Guestworker Dep. Testimony.)

During those first days in Florida, the workers also completed their tax paperwork and, for the

2008–09 season, set up a bank account at Bank of America to receive their pay by direct deposit.

(*Id.* at 53–55; 2/13/14 Tr. (Bartos) at 39–40; 2/13/14 Tr. (P. Camacho Garcia) at 97.)

### D.    *Harvesting Assignments*

CCLP has numerous groves, which are divided into blocks.  The blocks range from 30 to

100 acres each.  (2/18/14 AM Tr. (Reyes) at 5–7.)  Multiple crews—between 5 and 15 crews,

with 20 to 25 pickers each—from farm labor contractors would work different parts of a block at

the same time.  (*Id.* at 6–7; 2/19/14 Tr. (Berginc) at 134–36.)

In early fall, prior to the harvest season, CCLP's harvesting supervisors would tour the

groves, estimate the expected yields for each block, and forward that information to Shelton,

their manager.  (Stip. No. 17; 2/18/14 AM Tr. (Reyes) at 58–62.)  With those estimates and

historical data, Shelton would estimate the number of workers needed for the harvest.  (2/19/14

Tr. (Shelton) at 104–06.)  According to Shelton, each contractor would tell him how many H-2A workers they could bring, as a logistical matter.[11]  (*Id.*)  He would tally that number of harvesters towards his total goal and continue planning with the labor contractors until he had secured enough labor.  (*Id.* at 105–08.)

Before the harvest begins, the harvesting supervisors test the fruit to determine the acid-brix ratio.  (2/19/14 Tr. (Shelton) at 24–25.)  Shelton would instruct them where to test and would review the results to decide which block was optimal for picking.  (*Id.* at 24–26, 28.)  Throughout the season, each block of fruit would be tested repeatedly, up to 10 times, in an effort to maximize the pound solids.  (*Id.* at 27; *see also* 2/18/14 AM Tr. (Reyes) at 33–37.)

Based on the needs of the processing plants and the readiness of the fruit, Shelton would decide which block should be harvested next, and by which contractor.  (2/18/14 AM Tr. (Reyes) at 36–37; 2/19/14 Tr. (Shelton) at 18–21, 67–68; *see* Stip. No. 40.)  The harvesting supervisor would then tell each individual crew where to pick (at least for the first day at a new grove) and how many trailers to fill per day.  (2/19/14 Tr. (Shelton) at 18; 2/18/14 AM Tr. (Reyes) at 17, 42–45; 2/19/14 Tr. (Berginc) at 154–55.)  Once the harvesters filled the allocated number of trailers desired by the processors, the crew would be done for the day.[12]  (2/18/14 AM Tr. (Reyes) at 44–47.)  The supervisors contacted Shelton about two days before a block would be finished, and he would prepare the next assignments.  (*Id.* at 36–37; *see also* Stip. Nos. 3–4, 41.)

---

[11] Ruiz testified that CCLP told him how many workers RHI would need to harvest a particular grove.  (Ruiz 6/2/11 Dep. at 87–88; *see also* CCLP Tr. Ex. 27 (2008–2009 Estimated Work Itinerary created by CCLP for RHI) (listing how many workers would likely be needed for nine different groves)).)  This testimony does not contradict Shelton's testimony that the contractors informed him how many total workers they could provide each season.

[12] Shelton also testified that, at times, the crews could pick as much as they wanted, depending on the processors' schedule, the crews' productivity, and the weather.  (2/19/14 Tr. (Shelton) at 68–69.)

E.      *Pick and Roadside Rates*

1.      *Total Pick and Roadside Rates*

Based on their contract, CCLP paid RHI a total "pick and roadside rate" for its services based on "the net number of boxes of fruit harvested as determined by the weight of the fruit as delivered by CCLP's hauling contractors" to the processing plants.  (Stip. No. 18; Pls. Tr. Ex. 4 (Independent Contractor Harvesting Agmt. – H-2A, for the 2008–2009 season [hereinafter *08– 09 Agmt.*]); *see also* Stip. No. 5.)  In an attachment to each season's contract, CCLP agreed to pay RHI a minimum amount per weighted box of oranges.  (*See* 08–09 Agmt., Attach. A § 1.0; 2/19/14 Tr. (Shelton) at 33–36, 70–72, 82.)  That rate covered the piece-rate wages owed to the worker for each box picked ("pick rate"), as well as RHI's operating costs ("roadside rate").  (2/19/14 Tr. (Shelton) at 33–36 (explaining that the roadside rate includes the contractor's profit as well as fuel, equipment costs, etc.).)

For the 2007–2008 and 2008–2009 seasons, the total minimum price per box promised by CCLP was $1.42.  (08–09 Agmt., Attach. A § 1.0; *see also* Ruiz Dep. at 19–20; Pls. Tr. Ex. 3 (Independent Contractor Harvesting Agmt. – H-2A, for the 2007–2008 season [hereinafter *07– 08 Agmt.*]).)  At that price, CCLP assumed that RHI would pay a wage rate of $.70 per box and agreed to increase the roadside rate by two cents if the pick rate increased by five cents.  (08– 09 Agmt., Attach. A § 1.0; 2/19/14 Tr. (Shelton) at 36–37, 119.)  Although CCLP was bound to pay that contractual minimum, the actual pick and roadside rate paid to RHI was considerably higher.  (2/19/14 Tr. (Shelton) at 34, 70–72, 81–82, 121–22.)  The average pick and roadside rate that CCLP paid to RHI during the 2007–2008 season was $2.03, and the average during the 2008–2009 season was $2.08.  (*Id.* at 121–22; 2/20/14 Tr. (Bartos) at 14–15.)

The pick and roadside rate varied based on the particular grove being harvested.  (*See, e.g.*, Ruiz Dep. at 19–21, 67; 2/19/14 Tr. (Shelton) at 37–45, 54–56.)  Shortly before beginning the harvest in a particular block, CCLP's harvesting supervisors toured the block to set an initial pick rate.  (2/18/14 AM Tr. (Reyes) at 65–70; 2/19/14 Tr. (Berginc) at 164–66.)  When the crew arrived, the harvesting supervisor offered a pick rate and discussed that rate with the contractor and/or the contractor's crew leader.  (2/18/14 AM Tr. (Reyes) at 65–70; 2/19/14 Tr. (Berginc) at 164–66; *see also* 2/19/14 Tr. (Shelton) at 41–43.)  The supervisor then used a reference chart to show what the total pick and roadside rate would be, using the agreed-upon pick rate for that block.  (2/18/14 AM Tr. (Reyes) at 67–69; 2/19/14 Tr. (Berginc) at 166–67.)  Additionally, CCLP would consider raising the price at the contractor's request if, for example, the workers would not be able to make the minimum wage at a particular grove.[13]  (2/18/14 AM Tr. (Reyes) at 70–77; 2/19/14 Tr. (Berginc) at 167–69; *but see* Ruiz Dep. at 20 (stating that they did not negotiate, but that CCLP simply offered a higher rate if the picking was bad).)  Most (about 80%) of the time, the pick and roadside rate for blocks within a grove remained the same; thus, CCLP and RHI did not negotiate the rate each morning but only when crews started new groves or needed an adjustment.  (2/19/14 Tr. (Shelton) at 43–44.)  Shelton had the final say on what total rate CCLP would pay RHI.  (*Id.* at 40–41.)

## 2.    *The Pick Rates Paid by RHI*

On the record before us, it is undisputed that CCLP ultimately set the total pick and roadside rate that it paid RHI throughout the relevant seasons.  The parties dispute, however, whether that fact also means that CCLP determined the pick rate that RHI paid the harvesters.

---

[13] Alternatively, CCLP might move the crew to another grove, where the oranges would be more plentiful and/or easier to pick, resulting in a higher wage to the harvesters.  (2/19/14 Tr. (Shelton) at 54–56, 89–90.)

CCLP points out that, as part of its temporary labor certification application, RHI established the minimum rate it would pay its workers. (CCLP Post-Tr. Mem. at 10.) Indeed, in its job clearance orders—which constituted the contracts between RHI and the workers—RHI stated the pay rate per tub of oranges and reported that, in any event, the harvesters' pay would reach the applicable federally-required adverse effect wage rate ("AEWR").[14] (*See* Pls. Tr. Exs. 1–2 (Agricultural and Food Processing Clearance Orders, DOL ETA Form 790) ¶ 11.) RHI represented that, if a harvester's total piece-rate earnings did not meet AEWR, RHI would provide supplemental or "build-up pay" to the worker. (*Id.*; *see also* 2/14/14 Tr. (Celaya) at 44–46 (explaining that the payroll system automatically adds the difference if the worker's piece-rate wages do not meet AEWR).)

CCLP witnesses consistently testified that they had no idea what RHI ultimately decided to pay the harvesters. Shelton testified that, aside from the contractual assumption that the pickers would earn at least $.70 per box, CCLP generally did not know what RHI paid the harvesters. (2/19/14 Tr. (Shelton) at 75–76, 88.) Shelton stated that RHI could pay a straight hourly wage or a piece rate, at RHI's discretion. (*Id.* at 76.) Shelton explained that CCLP would learn the particular pick rate on a block only if RHI complained that the workers would not meet AEWR through their piece-rate wages alone. (*Id.* at 87–90.) According to Christopher Reyes, who was a CCLP harvesting supervisor for 18 years, one of the several contractor crews he supervised would seek an adjustment about once a week. (2/18/14 AM Tr. (Reyes) at 77.) In such a situation, Shelton was more likely to move the crew to another block rather than raise the rate CCLP paid RHI. (2/19/14 Tr. (Shelton) at 54–56, 89–90.) Reyes recalled one instance

---

[14] AEWR for the 2007–2008 harvest was $8.56 and rose to $8.82 for the 2008–2009 season.

where RHI requested such an increase, which CCLP granted.  (2/18/14 AM Tr. (Reyes) at 94–95.)

Reyes testified that he set the opening pick price during discussions with the contractor as the harvest began at a particular location.  (2/18/14 AM Tr. (Reyes) at 66–69.)  After settling on the pick rate, Reyes then showed the contractor what the total pick and roadside rate would be based on CCLP's reference chart.  (*Id.*; *see* Pls. Tr. Ex. 5.)  Reyes testified, however, that he did not know what RHI actually paid the pickers.  (2/18/14 AM Tr. (Reyes) at 93–94.)  Charlie Berginc, who was also a harvesting supervisor in the relevant time period, testified similarly.  (2/19/14 Tr. (Berginc) at 174–76.)  Berginc further explained that, although the harvesting supervisors and contractor crew leaders completed tickets in the field to track the oranges picked, the tickets would not include the pick rate intended for the harvesters.  (*Id.* (noting that the tickets indicated only the *total* pick and roadside rate); *see also* 2/19/14 Tr. (Shelton) at 85–87.)

Ruiz, on the other hand, repeatedly stated in his deposition that CCLP—not RHI—set the harvesters' pick rate.  (Ruiz Dep. at 21, 56, 68.)  Ruiz acknowledged that CCLP did not set the rates appearing in RHI's clearance orders.  (*Id.* at 100–101.)

Celaya, RHI's third-party bookkeeper, testified that Ruiz gave her the piece rate information to be used when preparing the harvesters' paychecks.  (2/14/14 Tr. (Celaya) at 45.)  She stated that the workers might have several difference piece rates in a week.  (*Id.* at 55; *see, e.g.*, Pls. Tr. Ex. 13 (sample paystubs for R. Ismael Estrada, showing piece rates varying from $1.20 to $2.00 per box); CCLP Tr. Exs. 75–85 (harvester pay records, including "History List" reports from both seasons that show piece rates ranging from $.95 to $2.00 per box).)  Celaya explained that she would receive the hours worked for each harvester from CCLP (who owned the timekeeping equipment) but would receive the number of boxes picked and relevant piece

rate from Ruiz. (2/14/14 Tr. (Celaya) at 45.) She combined that information to generate RHI's payroll, and the software program would automatically add build-up pay to a worker's paycheck if a worker did not meet AEWR with his piece-rate wages alone. (*Id.* at 44–46.)

Based on our review of this testimony in the context of trial, we find that RHI alone determined the harvesters' piece rate. Neither the total rate set by CCLP, nor the associated reference chart, obligated RHI to pay its harvesters a particular piece rate. Most of the time, CCLP and RHI did not discuss the piece rate after the initial discussion in the field about an appropriate rate for the block. The pick rate was not included in either the field or trip tickets prepared by CCLP and RHI each day. CCLP witnesses consistently testified that they did not know what RHI paid the harvesters. Even if RHI requested and received an adjustment for a particular block, CCLP did not know what RHI actually paid the workers come payday.

Perhaps most importantly, Celaya—a very credible third-party witness—testified that she received the pick rate information used for the harvesters' paychecks directly and exclusively from Ruiz.[15] At that point, Ruiz could instruct Celaya to use whatever pick rate he wanted, whether or not it matched the number previously discussed with CCLP. Although Ruiz stated in his deposition that CCLP set the pick rate,[16] the record does not indicate whether Ruiz in fact used the CCLP number when instructing Celaya, either as a general practice or at any particular time. And Ruiz understood that AEWR requirements, included in his clearance orders, were not issued by CCLP. (Ruiz Dep. at 20–21, 100–101.) On the record before us, we cannot draw the

---

[15] Celaya also received other payroll information from Ruiz, including the workers' I-9 forms. (2/14/14 Tr. (Celaya) at 80–81.) On a related note, the harvesters' paystubs included RHI's federal identification number, not CCLP's. (*Id.* at 81.) RHI provided her with reimbursement information for the harvesters, not CCLP. (*Id.* at 82–85.)

[16] We decline to rely heavily on Ruiz's deposition testimony on this point, in part because we did not have the opportunity to assess his demeanor as a witness at trial.

conclusions that the pick rate set in the field was intended to become the rate that RHI paid the pickers, ultimately did become their pick rate, or that CCLP required it.

### F.  Harvesting Operations in CCLP's Groves

#### 1.  Arrival and Clock In

With the block assignments and total pick and roadside rates set, the harvesters could begin their labor.  It is undisputed that RHI decided when the harvesters would arrive to their assigned CCLP grove, although CCLP plainly expected them there in the early morning.  (Ruiz Dep. at 64–65; 2/19/14 Tr. (Berginc) at 154; 2/18/14 PM Tr. (R. Ismael Estrada) at 14.)  RHI transported the workers to the grove on RHI vehicles.  (2/14/14 Tr. (P. Guerrero Fabian) at 33; 2/18/14 PM Tr. (R. Ismael Estrada) at 14.)  CCLP's supervisors would wait by the main entrance to the grove for the contractors to arrive.  (2/18/14 AM Tr. (Reyes) at 10.)

During the relevant seasons, the harvesting supervisors clocked in the workers upon their arrival to the grove.  (Stip. Nos. 20–22; 2/18/14 AM Tr. (Reyes) at 4–5, 10–16.)  CCLP used its own timekeeping equipment to track the hours worked by the contractor crews, including RHI. (Stip. No. 20.)  Harvesting supervisors created identification badges for the harvesters, for both the contractor and inhouse CCLP crews, which contained a bar code to electronically record their entrance to and departure from the grove.  (Stip. No. 23; 2/18/14 AM Tr. (Reyes) at 11–15.)  To prepare the badges, CCLP supervisors met with RHI personnel and the harvesters at the beginning of each season to gather information and take photos.  (Stip. No. 24; see 2/19/14 Tr. (Berginc) at 157–58 (explaining that CCLP used information about the harvesters provided by RHI when creating the badges); 2/18/14 AM Tr. (Reyes) at 11–15 (describing the process and stating that the only difference in the badges among crews is the employer's name); see also

2/12/14 Tr. (Bartos) at 73–76.)  CCLP gave the badges to RHI to distribute to the workers.

(2/18/14 AM Tr. (Reyes) at 15.)

### 2. *Citrus Canker Procedures*

Prior to 2006, CCLP implemented certain procedures in an effort to prevent the spread of

the citrus canker disease.[17]  (Stip. No. 43.)  As part of that effort, and particularly in the 2007–

2008 season, harvesters were required to walk through an anti-bacterial mist as they entered and

exited the grove each day.[18]  (Stip. No. 44; 2/12/14 Tr. (Bartos) at 86–87; 2/18/14 AM Tr.

(Reyes) at 17, 27–33.)  CCLP required the harvesters to dip their picking sacks into a barrel of

decontamination solution prepared by CCLP.  (Stip. No. 44; 2/12/14 Tr. (Bartos) at 86–87;

2/18/14 AM Tr. (Reyes) at 17, 27–33.)  CCLP also supervised as the contractors rinsed their

equipment, including tubs and lifts, with the solution.  (2/18/14 AM Tr. (Reyes) at 29–30.)  On

occasion, CCLP's harvesting supervisors inspected RHI's vehicles "to ensure that all of [RHI's]

harvesters, tools, and equipment were decontaminated."  (Stip. No. 46; 2/18/14 AM Tr. (Reyes)

at 29 (stating that he didn't board the buses every day but did do so "every now and then").)  In

addition, under CCLP's policy, workers could be quarantined for a day after working in an

infected grove before beginning work again in a new grove.  (Stip. Nos. 14–15; *see also*

2/18/14 AM Tr. (Reyes) at 31–33.)

CCLP's written canker procedure for the 2007–2008 harvest stated that the company

would have zero tolerance for any non-compliance.  (Stip. No. 16; *see* 07–08 Agmt. at 20 (Citrus

---

[17] Some trial testimony inferred that the State of Florida designed and imposed the citrus canker procedures.  (2/12/14 Tr. (Bartos) at 88.)

[18] Evidence presented at trial suggested that CCLP took these canker procedures more seriously during the 2007–2008 season.  (*See, e.g.*, 2/12/14 Tr. (Bartos) at 86–88; 2/18/14 AM Tr. (Reyes) at 27, 31–32 (stating that various steps were taken "at the beginning").)  Furthermore, the 08–09 Agmt. with RHI did not include a written attachment for Citrus Canker Procedures, as did the 07–08 Agmt.

Canker Procedure, signed 8/20/07 by Ruiz).)  Trial witnesses did not recall any instance where RHI or its pickers were quarantined or otherwise reprimanded under the policy.  (*See* 2/19/14 Tr. (Shelton) at 84–85, 126 (stating that he was unaware of any crews that were prevented from working based on the quarantine policy); 2/19/14 Tr. (Berginc) at 152–53, 176 (testifying that he did not recall stopping a RHI crew from harvesting for any reason during the relevant seasons); 2/14/14 Tr. (P. Guerrero Fabian) at 39.)

### 3. *Harvesting Routine and Clock Out*

Once the harvesters clocked in and walked through the canker wash at the gate, they travelled to their assigned block and began picking oranges.  RHI provided the harvesters with ladders and picking sacks for their labor.  (Ruiz Dep. at 66; 2/14/14 Tr. (P. Guerrero Fabian) at 35–36.)  RHI also supplied the workers with drinking water and maintained portable toilets in the field.  (Ruiz Dep. at 66; 2/19/14 Tr. (Berginc) at 156–57; 2/13/14 Tr. (Bartos) at 55; *see also* 2/13/14 Tr. (Delgado) at 144.)

After a harvester filled his picking sack, he dumped the oranges into a tub owned by RHI. (2/12/14 Tr. (Lucas) at 51; *see also* 2/13/14 Tr. (P. Camacho Garcia) at 121–22.)  When a tub was filled, the contractor's crew leader used a high lift, commonly called a "goat," to unload the tub of oranges into a fruit trailer located at the end of the road.  (2/12/14 Tr. (Lucas) at 49–50; 2/13/14 Tr. (P. Camacho Garcia) at 122.)  RHI owned several goats, which were operated by its crew leaders, such as Ruiz and his brothers.  (Ruiz Dep. at 8–15, 63; 2/18/14 AM Tr. (R. Ismael Estrada) at 113; Guestworker Dep. Testimony.)  CCLP did not provide or maintain RHI's equipment.  (2/19/14 Tr. (Berginc) at 148–49, 157.)

Throughout the day, CCLP's harvesting supervisors checked on the various crews, who were spread across thousands of acres.  (*See* 2/18/14 AM Tr. (Reyes) at 96–98 (stating that his

territory covered 8000 acres daily); 2/19/14 Tr. (Berginc) at 135–36 (stating that his crews were scattered across a twelve-mile radius).)  On average, each supervisor was responsible for ten or eleven crews each day, about half of which were contractor crews.  (2/18/14 AM Tr. (Reyes) at 7, 81–83; 2/19/14 Tr. (Berginc) at 135–36.)  Every crew included roughly twenty-five harvesters, representing a total of 200 to 300 workers every day per harvesting supervisor. (2/18/14 AM Tr. (Reyes) at 7, 81–83; 2/19/14 Tr. (Berginc) at 135–36.)  To cover this ground, the harvesting supervisors drove to each picking site, checked in for ten or fifteen minutes, and then moved on, continuing this rotation all day.  (2/18/14 AM Tr. (Reyes) at 42, 47–48, 98–100; 2/19/14 Tr. (Berginc) at 133–36.)  Reyes estimated that he interacted with each crew approximately 90 minutes each day in total, including clocking the workers in and out.  (2/18/14 AM Tr. (Reyes) at 107–09.)

The harvesting supervisors performed several tasks while checking in with each crew. They confirmed that the crew was picking in the right place.  (2/18/14 AM Tr. (Reyes) at 4–5, 40; *see also* 2/13/14 Tr. (Bartos) at 53–57.)  They scanned the block for fruit mistakenly left on trees (known as "shiners"), garbage, debris in tubs or trailers, and obvious safety hazards. 2/18/14 AM Tr. (Reyes) at 41–42, 47–49; 2/19/14 Tr. (Berginc) at 137–38.)  For example, the supervisors would note low power lines.  (2/18/14 AM Tr. (Reyes) at 51–53; 2/19/14 Tr. (Berginc) at 139.)  The supervisors made sure that crews had enough trailers and coordinated with CCLP's contracted haulers, who removed full trailers and delivered them to the processing plants.  (2/18/14 AM Tr. (Reyes) at 37–40; 2/19/14 Tr. (Berginc) at 133; *see* 2/12/14 Tr. (Lucas) at 49–50.)  The supervisors also filled out trip tickets, which provided information about the oranges, the picking crew, and the total pick and roadside rate.  (2/18/14 AM Tr. (Reyes) at 42, 47–48, 53–58; 2/19/14 Tr. (Berginc) at 133, 138–39, 140–42, 160–62.)  They attached the trip

18

tickets to the trailers headed to the plant.  (2/18/14 AM Tr. (Reyes) at 47–48, 53–54.)  The supervisors might also test fruit as they passed through the groves.  (2/13/14 Tr. (Bartos) at 53–54.)

When checking on a contractor crew, CCLP's harvesting supervisors dealt specifically with the crew leader.  Thus, for example, if a supervisor noticed shiners or garbage, he would speak to Ruiz and/or the crew leader and ask RHI to rectify the situation.  The harvesting supervisors did not interact directly with RHI harvesters.  (2/18/14 AM Tr. (Reyes) at 42, 50–53; 2/19/14 Tr. (Berginc) at 137–38; 2/19/14 Tr. (Shelton) at 15–18, 77–78; Ruiz Dep. at 71–72.)  By contrast, CCLP personnel would spend a little more time with CCLP H-2A crews and would speak personally with inhouse harvesters about their productivity or shiners, as well as with their foreman.  (2/18/14 AM Tr. (Reyes) at 100–03; 2/19/14 Tr. (Berginc) at 146–47; 2/19/14 Tr. (Shelton) at 76–78, 123; *see, e.g.*, 2/13/14 Tr. (Delgado) at 160–65.)

CCLP witnesses testified as to additional differences in the treatment of contractor H-2A crews and inhouse H-2A crews.  The harvesting supervisors would check on CCLP equipment and help handle equipment glitches.  (2/19/14 Tr. (Berginc) at 148.)  Thus, for example, the supervisor would locate a replacement ladder or arrange for a mechanic to fix flat tires for inhouse crews, but not for RHI crews.  (*Id.*)  Harvesting supervisors documented any workplace injuries for CCLP crews, but not for RHI crews.  (*Id.* at 151–52; 2/13/14 Tr. (Delgado) at 164–65; *see also* Ruiz Dep. at 71–75.)  CCLP staff might remind inhouse workers to wear their safety goggles.  (2/13/14 Tr. (Delgado) at 163–64 (testifying that he chats with inhouse workers daily).)  Supervisors might also get involved in personnel matters within CCLP crews, but would not interfere with the crew assignments for RHI harvesters.  (2/19/14 Tr. (Berginc) at 149–51 (explaining that he might reassign inhouse workers due to personality conflicts).)  Finally, CCLP

would inform its inhouse H-2A pickers when to return to Florida if they went home during the February harvesting slowdown, but it does not instruct outside crews whether to leave or when to return.  (2/12/14 Tr. (Bartos) at 65–66; 2/13/14 Tr. (Bartos) at 51–52.)

At the end of each workday, the crew leader contacted the harvesting supervisor to let him know that the crew had filled their loads for the day.  The harvesting supervisor would meet each crew at the gate and clock out the workers, scanning their badges.  (2/18/14 AM Tr. (Reyes) at 106; 2/19/14 Tr. (Berginc) at 153–54.)  That evening, the supervisors printed out a report for each crew showing each harvester's in and out times for that day and total hours worked.  (*See* CCLP Tr. Ex. 51 (sample payroll worksheet for a RHI crew).)  The following day, the harvesting supervisor gave that report to the contractor's crew leader, along with the trip tickets from the prior day.  (2/18/14 AM Tr. (Reyes) at 18–20, 57–58, 85–86; 2/19/14 Tr. (Berginc) at 143–45; Stip. Nos. 25–26.)

### G.   *Payment of Harvesters*

#### 1.   *Payroll Procedures*

CCLP owned the timekeeping equipment used to track the hours worked by the RHI harvesters.  As noted above, CCLP provided its contractors with a report summarizing each harvester's hours for the previous work day.  In addition, CCLP emailed a weekly report with that same information to RHI's payroll vendor, Celaya.  (2/14/14 Tr. (Celaya) at 45–48; Stip. No. 27.)  It is undisputed that the figures provided by CCLP for total hours worked per harvester reflected a deduction "of up to one hour per workday . . . to account, in part, for travel time between the gate at the grove entrance and the actual picking site."[19]  (Stip. No. 28; *see also*

---

[19] Plaintiffs challenge this "gate deduction" in this action as well.  As discussed in a prior opinion, we bifurcated the gate deduction claim because the parties require additional discovery to fully litigate it.  (Dkt. No. 191 (2/4/14 MIL Op.) at 5.)

2/13/14 Tr. (Delgado) at 167–69; 2/12/14 Tr. (Bartos) at 84–85 (explaining that the hour deduction included time for travel and for a lunch break).)  Celaya and her staff used the CCLP report to enter into the payroll software the harvesters' total hours worked for the applicable pay period.  (*Id.* at 47–48 (stating that they did not need the workers' in/out times, just the total hours per day).)  RHI gave her the workers' piece rate(s) and number of boxes picked.  (*Id.* at 45.) Using that information, Celaya prepared the payroll and paystubs for the workers.  During that process, the software program automatically added build-up pay to a worker's paycheck as needed to reach AEWR.  (*Id.* at 53.)

When the payroll was complete, Celaya sent a file back to CCLP with the gross and net payroll for each harvester.  (*Id.* at 51–52; *see also* Stip. No. 32.)  She also sent CCLP the Attestation Agreement signed in her presence by Ruiz.  (2/14/14 Tr. (Celaya) at 95; *see also* CCLP Tr. Ex. 6 (Attestation Agmt. for week ending 3/30/08).)  By his signature, and pursuant to RHI's agreements with CCLP, Ruiz certified that the workers had been paid AEWR and that RHI had otherwise complied with its contractual obligations.  (CCLP Tr. Ex. 6.)

RHI paid the harvesters by check for the 2007–2008 season.  (Stip. No. 29.)  At CCLP's instruction, RHI switched to direct deposit for the 2008–2009 season.  (Stip. No. 30; 2/12/14 Tr. (Bartos) at 39–40; *see also* 2/14/14 Tr. (Celaya) at 90; Ruiz Dep. at 53–56 (testifying that CCLP decided to proceed with direct deposit and Ruiz chose the bank).)  Either way, the paystubs indicated the harvesters' hours worked, applicable piece rate(s), boxes picked at each rate, and any build-up pay.  The entry representing build-up pay was readily identifiable on the stub and included the total amount added to meet AEWR for that pay period.  (Pls. Tr. Ex. 13; 2/14/14 Tr. (Celaya) at 53–60.)  Celaya gave RHI the paychecks and/or paystubs, and RHI distributed them

to the harvesters on payday.  (2/14/14 Tr. (Celaya) at 89–90; 2/13/14 Tr. (P. Camacho Garcia)

at 96–97; 2/14/14 Tr. (P. Guerrero Fabian) at 36–37.)

In addition to receiving the final payroll from Celaya, and the Attestation Agreement

signed by Ruiz, CCLP conducted random audits of RHI's recordkeeping.  (Stip. Nos. 33–34.)

Ismael Delgado, King Ranch's Safety Environmental Loss Control and Labor Relations

Manager, would visit Celaya's office to spot check RHI's employment records.  (2/13/14 Tr.

(Delgado) at 132, 137–42 (explaining this process, which he did for all labor contractors).)

Delgado would compare the final payroll report sent by Celaya with the records in the office, to

make sure there were no discrepancies.  (*Id.* at 137–39.)  He would check I-9 documentation and

would verify that the hours reflected in the weekly payroll report matched the hours recorded by

CCLP's timekeeping equipment.  (Stip. No. 34; 2/13/14 Tr. (Delgado) at 138.)  Delgado also

reviewed records of reimbursements paid to the workers for their travel expenses from Mexico.

(2/13/14 Tr. (Delgado) at 139–42.)  In doing so, Delgado checked to see if RHI paid any

reimbursement, but he did not investigate whether the amount was correct.  (*Id.*; *see also*

Stip. Nos. 38–39.)

In conducting these audits, CCLP intended to ensure RHI's compliance with their

agreements, which required RHI to properly pay its workers.  (*Id.* at 145–46, 155–57;

Stip. No. 33; *see also* CCLP Tr. Exs. 7, 12 (Contractor Payroll Audit Reports, generated by

Delgado to check that RHI was paying AEWR).)

### 2. *Alleged Kickbacks*

Among other things, Plaintiffs allege in this lawsuit that RHI required the class members

to regularly return some of their pay, resulting in wages that failed to satisfy AEWR.  RHI

guestworkers uniformly testified that RHI personnel demanded that they give back any build-up

pay included in their weekly wages.  (2/13/14 Tr. (P. Camacho Garcia) at 98–102; 2/14/14 Tr. (P. Guerrero Fabian) at 11–16, 22; 2/18/14 AM Tr. (R. Ismael Estrada) at 117–21; 2/18/14 PM Tr. (R. Ismael Estrada) at 3–5; Guestworker Dep. Testimony.)  Numerous harvesters stated that Ruiz (or another RHI representative) told them that the build-up pay came out of Ruiz's pocket and, if they did not return it, he would send them home.  (2/14/14 Tr. (P. Guerrero Fabian) at 9–10, 15; 2/18/14 PM Tr. (R. Ismael Estrada) at 3; Guestworker Dep. Testimony.)

Typically, on payday, RHI's crew leaders drove the harvesters to the bank, where they withdrew their wages.  As the workers re-boarded the vehicle, the crew leader consulted a list and collected cash from the workers, representing their build-up pay for that week as indicated on their paystubs.  (2/13/14 Tr. (P. Camacho Garcia) at 98–102; 2/14/14 Tr. (P. Guerrero Fabian) at 9–10, 15; 2/18/14 PM Tr. (R. Ismael Estrada) at 3, 19; Guestworker Dep. Testimony.)  The amount varied, along with the amount of build-up needed per pay period, and workers were not required to return any wages if they satisfied AEWR based on their own picking and productivity.  (2/13/14 Tr. (P. Camacho Garcia) at 101–03; 2/14/14 Tr. (P. Guerrero Fabian) at 14–15; 2/18/14 AM Tr. (R. Ismael Estrada) at 118; Guestworker Dep. Testimony.)  In light of the guestworkers' similar, credible, and corroborating testimony, we have no doubt that RHI took advantage of the harvesters and wrongfully required them to return their build-up pay.

Whether CCLP can be held liable for RHI's misconduct as a joint employer of the harvesters is, of course, the question presented.  The parties have stipulated that no one from CCLP demanded that the harvesters return these wages.  (Stip. No. 47.)  It is further undisputed that no Plaintiff or class member complained to CCLP about RHI's kickback requirement.[20]

---

[20] Although CCLP had received notice of other kickback allegations, RHI was neither implicated at that time nor investigated.  In response to those claims, however, CCLP required its

(Stip. No. 48.)  In fact, several of the guestworkers testified that they did not know anything about CCLP and considered only RHI employees to be their supervisors.  (*See* Guestworker Dep. Testimony; 2/14/14 Tr. (P. Guerrero Fabian) at 33, 39; 2/18/14 AM Tr. (R. Ismael Estrada) at 13–14, 21.)

### H.    *Contractual Rights and Obligations*

In addition to the above-mentioned payroll reporting and audit procedures, RHI's contract with CCLP imposed other requirements.  RHI was obligated to provide "payroll registers showing the payment of transportation, subsistence and visa reimbursements" to the harvesters.  (Stip. No. 38.)  CCLP required RHI to submit a spreadsheet to Delgado identifying the categories of fees and expenses included in those travel reimbursements.  (Stip. No. 39; *see* 2/13/14 Tr. (Delgado) at 139–42; 2/13/14 Tr. (Bartos) at 23–24.)

RHI also submitted another attestation to CCLP, in addition to the Attestation Agreement submitted each pay period.  CCLP's contractor agreements included a Migrant Housing Attestation by which RHI acknowledged its separate legal obligations to provide housing for the harvesters and to ensure that the housing met certain standards.  (07–08 Agmt. at 18 & 08–09 Agmt. at 19 (Migrant Housing Attestations, signed by Ruiz); 2/13/14 Tr. (Bartos) at 18–19.) RHI agreed to give CCLP copies of its farm labor contractor licenses and, as mentioned earlier, payroll-related documentation.  (2/13/14 Tr. (Bartos) at 21; 07–08 Agmt. § 11.2; *see, e,g.*, CCLP Tr. Ex. 35 (CCLP file with RHI farm labor certification materials).)  RHI also provided documentation evidencing its training of the workers on safety procedures.  (2/13/14 Tr. (Delgado) at 151–52; *see, e.g.*, Pls. Tr. Ex. 6 & CCLP Tr. Ex. 50 (sample Harvest Registration Forms, signed by Ruiz, certifying that a particular worker received pesticide safety training).)

---

contractors to include a notice with each paystub that the worker was entitled to keep all wages. (2/13/14 Tr. (Delgado) at 146–47; 2/13/14 Tr. (Bartos) at 35–36; *see* 07–08 Agmt. § 11.9.)

Under the contractor agreements, RHI was responsible for maintaining its own liability, workers' compensation, and automobile insurance coverage. (07–08 Agmt. § 12; 08–09 Agmt. § 12; 2/13/14 Tr. (Delgado) at 133–36.) RHI was further obligated to include CCLP on its policies as an additional insured. (07–08 Agmt. § 12.3; 08–09 Agmt. § 12.3; 2/13/14 Tr. (Bartos) at 16–18.) At the beginning of each season, Delgado gathered all of the contractors' insurance and safety inspection documentation. (2/13/14 Tr. (Delgado) at 133–35.) He would confirm the insurance coverage and prepare a list for the harvesting supervisors of all contractor vehicles authorized to enter CCLP property. (*Id.*) As vehicles entered the grove, harvesting supervisors consulted the list to make sure that the vehicle could proceed. (*Id.* at 135–37; 2/18/14 AM Tr. (Reyes) at 20–25 (stating that the supervisors would also check the drivers' credentials).) CCLP policy dictated that contractor vehicles would be turned away if the insurance had lapsed, though witnesses did not recall that situation arising. (2/13/14 Tr. (Delgado) at 135–36, 153–54; 2/18/14 AM Tr. (Reyes) at 24–27, 87.)

Delgado conducted random audits of the contractors' buses and field conditions as well. (2/13/14 Tr. (Delgado) at 137, 142–44.) Delgado inspected each vehicle, inside and out, prior to the harvest season; once complete, he attached a sticker number for the harvest supervisors to reference during their morning checks. (*Id.* at 142–44.) When checking a job site, Delgado checked for toilets, hand washing facilities, and potable water. (*Id.* at 144 (testifying that he informed the contractor of any deficiencies).)

In the relevant contracts, CCLP reserved the right to halt the harvesters' work for any reason—whether due to poor weather, lapsed insurance, refusal of the processing plants to accept more loads, or a crew's performance. (07–08 Agmt. § 25.3; 08–09 Agmt. § 25.3 (providing that CCLP may "stop or delay [w]ork whenever . . . such stoppage is necessary"); 2/13/14 Tr.

25

(Bartos) at 14–15.)  CCLP representatives testified that they did, in fact, halt picking

occasionally under such circumstances.  (2/19/14 Tr. (Shelton) at 120–21; 2/19/14 Tr. (Berginc)

at 169–71.)  For its part, RHI retained the right under the agreements to work for other growers,

in addition to CCLP.  (2/20/14 Tr. (Bartos) at 22.)

## LEGAL ANALYSIS AND CONCLUSIONS

With these facts in mind, we turn to the legal framework and the merits of Plaintiffs'

case.  We first address CCLP's Rule 702 and Rule 52 motions raised at trial.  We then outline the

governing law and undertake the joint employment analysis as set forth in *Aimable v. Long &*

*Scott Farms*, 20 F.3d 434 (11th Cir. 1994).

### A.     *CCLP's Motion to Exclude Plaintiffs' Damages Expert*

At trial, CCLP objected to the testimony of Plaintiffs' damages expert, Brittany Amento,

and related exhibits.  (2/18/14 PM Tr. (Amento) at 36–37, 42–50.)  In her testimony, Amento

described how she calculated Plaintiffs' damages, including build-up pay and amounts based on

pre-employment expenses allegedly owed to each guestworker.[21]  (*Id.* at 25–36.)  Essentially,

Amento programmed Excel spreadsheets to calculate the damages and relied on timekeeping and

payroll records for her data.  (*Id.*)  For her analysis of the build-up pay claims, she compared the

harvesters' actual hourly rate based on their records (minus the kickback amount) to AEWR.

(*Id.* at 26–31, 34, 36.)  When inputting the data, Amento did not round the numbers or conduct

any investigation into the underlying records.  (*Id.* at 36, 38, 42.)

As for the pre-employment reimbursement claims, Amento took information from the

payroll records that indicated whether a guestworker received a check for pre-employment

---

[21] Amento also calculated damages for the gate deduction claims, which were bifurcated.  As discussed at trial, we review only the damage calculations prepared by Amento for the build-up pay and pre-employment travel reimbursement claims, as the gate deduction claims remain pending.

expenses, and for how much.  (*Id.* at 28.)  Plaintiffs' counsel provided Amento with the

Hotel Mexicano receipt, (Pls. Tr. Ex. 12), to document the harvesters' pre-employment expenses,

which Amento relied on for her damages calculations.  (*Id.* at 31–32, 38; *see also id.* at 46, 48.)

On cross-examination, Amento testified that she considered any initial reimbursement check

issued to the guestworkers but did not factor in any subsequent reimbursements.  (*Id.* at 39, 41.)

Amento also acknowledged that she did not calculate whether Plaintiffs' wages satisfied the

federal minimum wage, as pertinent to this FLSA claim.  (*Id.* at 51.)

      CCLP did not dispute Amento's qualifications as an expert or the mathematical accuracy

of her work.  CCLP, however, raised several specific objections to her calculations and

testimony under Rule 702(b), based on the assumptions underlying her conclusions.  Under

Rule 702, we may exercise our discretion to exclude the testimony of a proffered expert if the

testimony is unreliable or if it is not helpful to the trier of fact.  *Rosenfeld v. Oceania Cruises,*

*Inc.*, 682 F.3d 1320, 1328–29 (11th Cir. 2012); *Furmanite Am., Inc. v. T.D. Williamson, Inc.*, 506

F. Supp. 2d 1126, 1129–30 (M.D. Fla. 2007); *see Health & Sun Research, Inc. v. Australian*

*Gold, LLC*, 12 C 2319, 2013 WL 6086457, at *1–2 (M.D. Fla. Nov. 19, 2013).  Here, where

CCLP challenges a damages expert, we bear in mind that "proof [of damages] may be indirect

and it may include estimates based on assumptions, so long as the assumptions rest on adequate

grounds."  *Platypus Wear, Inc. v. Clarke Modet & Co.*, 06 C 20976, 2008 WL 8961521, at *4

(S.D. Fla. Oct. 10, 2008) (quoting *Lehrman v. Gulf Oil Corp.*, 500 F.2d 659, 668 (5th Cir.

1974)); *see, e.g.*, *Britt Green Trucking, Inc. v. FedEx Nat'l, LTL, Inc.*, 09 C 445, 2014

WL 2861485, at *3 (M.D. Fla. June 24, 2014).  For the reasons set forth below, we deny CCLP's

motion to strike Amento's testimony and related exhibits, although we also find that they may

not ultimately prove Plaintiffs' FLSA claims.

### 1.     *Testimony about H-2A Build-Up Wages*

CCLP objected to Amento's testimony as to the amount of build-up back pay on several grounds.  First, based on the testimony of Porfirio Camacho Garcia, CCLP argued that amount of build-up pay collected by RHI personnel was unknown to the extent that it differed from the amount reported on the guestworkers' paystubs.  CCLP emphasized that Camacho Garcia recalled returning more than $200 of build-up pay on one occasion, although his paystubs did not reflect any week in which his build-up pay was that high.  (2/18/14 PM Tr. (Amento) at 39–41.)  As Amento conceded, either Camacho Garcia's testimony was wrong, or the payroll records were wrong, (*id.* at 41), but we consider it far more likely that Camacho Garcia's memory failed him.  We have no reason to believe that the payroll records included errors.  More importantly, in light of the significant amount of consistent testimony from the guestworkers on this point, we have no reason to believe that RHI personnel collected build-up pay that regularly differed in any material way from the amounts indicated on the harvesters' paystubs.  (Guestworker Dep. Testimony; 2/13/14 Tr. (P. Camacho Garcia) at 98–102; 2/18/14 AM Tr. (R. Ismael Estrada) at 118–21.)  We reasonably infer, from the weight of the credible testimony from the workers, that RHI on a weekly basis demanded the return of the build-up pay amounts, rather than some other unknown sums.

CCLP's second objection to Amento's calculation of contractual damages attacks its precision.  CCLP rightly pointed out that harvesters testified that RHI personnel did not collect coins when demanding the kickbacks.  (*See* 2/18/14 PM Tr. (Amento) at 44.)  Thus, if the harvester's paystub reported an amount for build-up pay that included change, RHI did not demand the change but rounded off the amount.  (2/13/14 Tr. (P. Camacho Garcia) at 127; 2/14/14 Tr. (P. Guerrero Fabian) at 22; 2/18/14 AM Tr. (R. Ismael Estrada) at 19.)  CCLP argued

that, as a result, the actual kickback amounts are unknown and Amento's calculations relying on the paystub information is inaccurate.  (2/18/14 PM Tr. (Amento) at 44–45.)  Again, we disagree. The practice of rounding these amounts up and down certainly affects the precise amount of damages when calculating to the penny, but it does not affect the overall validity of Amento's methodology or conclusions based on the exact figures included on the paystubs.  Some kickback amounts were rounded up, some were rounded down—it all comes out in the wash. We find that the damage calculations on the whole are reliable, even if potentially inaccurate (either as overages or underages) by inconsequential amounts.

CCLP's objections to Amento's calculations as to build-up pay address the weight of her testimony rather than its admissibility.  We find that Amento's calculations as to build-up pay are admissible, as well as very credible.  Amento reviewed the extensive payroll records, compared actual wages to AEWR's requirements, and compiled spreadsheets that are helpful to us in our assessment of Plaintiffs' damages.  For these reasons, we deny CCLP's motion and credit Amento's testimony on this point.

## 2. Testimony about FLSA Pre-Employment Expense Reimbursement

For similar reasons, we find that Amento's work calculating amounts allegedly owed to the guestworkers for the pre-employment expenses is admissible.  Based on CCLP's objections, however, we cannot give Amento's conclusions much weight at this juncture.

In its first objection, CCLP contended that Amento's calculations could not be accurate because the guestworkers themselves often could not recall the specifics of their pre-employment expenses.  (2/18/14 PM Tr. (Amento) at 44.)  Indeed, many of the harvesters could not testify exactly how many days they stayed in Monterrey awaiting a visa or how much their expenses totaled for their journeys.  (*See, e.g.*, Guestworker Dep. Testimony.)  This factual gap would

indeed undermine the reliability of Amento's calculations.  In rebuttal, however, Plaintiffs'

counsel clarified that they are not seeking reimbursement for hotel or other miscellaneous

expenses but are seeking exclusively the expenses documented by the Hotel Mexicano receipt.

(2/18/14 PM Tr. (Amento) at 46 48.)  That receipt includes costs for three items, totaling $280:

the services of Rene Flores, the bus transportation to Florida, and the visa fee of $100.

(Pls. Tr. Ex. 12.)  The record suggests that all guestworkers incurred these expenses to work for

RHI, and CCLP has not argued otherwise.  (*See* Guestworker Dep. Testimony.)  Accordingly, to

the extent that Amento used the $280 figure for all of her calculations, we may be able to rely on

her testimony.

CCLP's second objection to these calculations is more substantive.  CCLP argued that

Amento's calculations are not credible because they did not include any additional

reimbursement checks issued to the workers later in the harvesting season.  (2/18/14 PM Tr.

(Amento) at 39, 41, 43–44.)  The record reveals that some workers were issued second checks

for reimbursement of pre-employment expenses.  (2/14/14 Tr. (Celaya) at 68–70.)  Amento

admitted that she did not include any subsequent reimbursement checks in her work but that her

total damages figures would be affected if she had done so.  (2/18/14 PM Tr. (Amento) at 39,

41.)

CCLP's third objection also has merit.  CCLP contended that Amento's findings are also

not worthy of credence because she did not check whether Plaintiffs' wages satisfied the federal

minimum wage.  Amento conceded that she did not run calculations comparing the hourly wages

of the guestworkers to the pertinent FLSA minimum wage.  (2/18/14 PM Tr. (Amento) at 51.)

Analysis of Plaintiffs' FLSA claim for pre-employment expenses involves, at least in part, a

comparison of actual wages paid in the first workweek to the FLSA minimum.  *See Arriaga v.*

*Fla. Pac. Farms, L.L.C.*, 305 F.3d 1228, 1241–45 (11th Cir. 2002); *Sejour v. Steven Davis Farms, LLC*, 28 F. Supp. 2d 1216, 1232–33 (N.D. Fla. 2014); *see also Ramos-Barrientos v. Bland*, 728 F. Supp. 2d 1360, 1377–78 (S.D. Ga. 2010) (describing the formula used to assess satisfaction of the FLSA's requirement that the employer pay not only the minimum wage but also "any expenses the employee incurs for the benefit of the employer," including travel and visa expenses).  "Where an employee's pay for the first workweek is less than the FLSA required minimum wage per hour plus qualifying pre-employment expenses, the employer violates the FLSA."  *Ramos-Barrientos*, 728 F. Supp. 2d at 1378; *see Sejour*, 28 F. Supp. 2d at 1232–33; *Ojeda-Sanchez v. Bland Farms, LLC*, 08 C 96, 2010 WL 3282984, at *8–9 (S.D. Ga. Aug. 18, 2010).  Here, it appears that Amento's calculations compare harvester earnings to the AEWR rate, not the FLSA rate.

Because of these shortcomings, we cannot at this time accept Amento's conclusions with respect to damages for the pre-employment expenses.  We ask the parties to submit further briefing on this issue, however.  Plaintiffs shall submit a brief no later than July 31, 2015.  In their supplemental brief, Plaintiff must confirm that Amento's calculations are based on damages for only the $280 documented in the Hotel Mexicano receipt and must discuss, based on record evidence, which workers paid these expenses.  Plaintiffs shall also address the impact of Amento's failure to include subsequent reimbursement checks in her damages amounts.  Finally, Plaintiffs shall explain how the FLSA reimbursement requirement is intended to work, how Amento calculated these damages, and how Amento's failure to use the FLSA minimum wage affects the value of her conclusions, if at all.

CCLP may file a response brief no later than August 31, 2015, and Plaintiffs may file a reply if they choose on or by September 14, 2015.  We will entertain the possibility of hearing

oral argument on these issues, if the parties believe that such argument would be helpful following briefing.

### B.      CCLP's Rule 52 Motion

At the close of Plaintiffs' case, CCLP moved for judgment under Rule 52(c) on several points.  Plaintiffs conceded two arguments raised by CCLP.  Consistent with those concessions, we granted the motion as to the FLSA claims of thirteen named plaintiffs[22] based on the 2007–2008 harvest season, which fell outside the applicable two-year statute of limitations.  We also granted the motion as to all claims for the 2009–2010 season, which Plaintiffs had decided not to pursue prior to trial.  (Dkt. No. 189 (Am. PTO) at 2 n.2.)  At trial, we took CCLP's remaining arguments under advisement, and we briefly address them now.[23]

In its oral motion, CCLP contended that none of the named plaintiffs asserting individual claims under the FLSA based on the 2008–2009 harvest season had offered sufficient proof.[24] Specifically, CCLP first asserted that twelve of those plaintiffs had not been deposed or testified,

---

[22] As identified by CCLP, the named Plaintiffs with 2007–2008 FLSA claims at issue are:
(1) Rodolfo Caballero-Palacio; (2) Porfirio Camacho-Garcia; (3) Emanuel Camacho-Linares;
(4) Raymundo Cruz-Vicencio; (5) Raul Ismael Estrada-Gabriel; (6) J. Carmen Gonzalez-Caballero; (7) Juvenal Gonzalez-Juarez; (8) Antonio Martinez; (9) Procoro Martinez-Aguilar;
(10) Ramon Ruiz-Landeros; (11) Palemon Sanchez-Huerta; (12) Miguel Sanchez-Morales; and
(13) Luis Vega-Camacho.  (*See also* Dkt. No. 34 (Am. Compl.) ¶ 80.)

[23] In light of our ruling today, we need not address CCLP's Rule 52 argument that it could not be liable to Plaintiffs' for the alleged H-2A violations for the 2007–2008 and 2008–2009 seasons as joint employer because it was not a signatory to the H-2A contracts with the harvesters.  Both the law and the facts support our conclusion that CCLP is liable as a joint employer.

[24] The amended complaint did not raise class claims under the FLSA.  (*Compare* Dkt. No. 34 (Am. Compl.) ¶ 88 (raising class claims for breach of contract) *with* ¶ 79 (raising claims only as to the listed named plaintiffs in Count IV).)  Indeed, the class was previously certified with respect to the breach of contract claims, but not the FLSA claims.  *See Garcia-Celestino v. Ruiz Harvesting, Inc.*, 280 F.R.D. 640, 644 (M.D. Fla. 2012) (certifying the class as to the contract claims, per Plaintiffs' request).  The class also covered claims under Count VI, which is no longer at issue.

resulting in a total lack of evidence in support of their claims.[25]  CCLP argued that the record

contains no evidence that these individuals were denied reimbursements resulting in wages that

violated the FLSA.  In response, Plaintiffs pointed out, quite rightly, that proof of these claims

does not require witness testimony if the elements of the claim can be proved by other evidence

in the record.  Plaintiffs then argued that the payroll records admitted at trial offer sufficient

evidence for them to prevail.

Relatedly, CCLP next argued that any remaining 2008–2009 named plaintiffs, as

identified in paragraph 81 of the amended complaint, failed to substantiate their damages as

necessary to succeed with their FLSA claims.  Relying on their Rule 702 arguments, CCLP

contended that these FLSA plaintiffs could not rely on Amento's testimony because she did not

calculate the damages for these claims using the FLSA minimum wage.  (2/18/14 PM Tr.

(Amento) at 51.)

As previously discussed, we agree with CCLP that there are concerns with Amento's

damages calculations as to the pre-employment expenses, to be addressed in the parties'

supplemental briefing.  In that briefing, the parties shall also address whether the record includes

sufficient evidence, from payroll records or otherwise, demonstrating that the twelve non-

testifying FLSA plaintiffs (identified in footnote 25) did not receive reimbursements for the

claimed pre-employment expenses.  In the meantime, CCLP's Rule 52 motion is granted in part,

as stated at trial, and is otherwise entered and continued.

---

[25] As identified by CCLP, the named Plaintiffs with 2008–2009 FLSA claims who did not testify
in any way are: (1) Miguel Aguilar-Guerrero; (2) Felipe Angeles-Gallardo; (3) Rodolfo
Caballero-Palacio; (4) Raymundo Cruz-Vicencio; (5) Gaudencio Garcia-Celestino; (6) J. Carmen
Gonzalez-Caballero; (7) Juvenal Gonzalez-Juarez; (8) Alfredo Mora-Martinez; (9) Juaquin
Resendiz-Alvares; (10) Martin Ruiz-Olanderos; (11) Reynaldo Sanchez-Ibarra; and (12) Luis
Vega-Camacho.  (*See also* Dkt. No. 34 (Am. Compl.) ¶ 81.)

### C.      Legal Standards for Liability and Analysis

As Judge Chappell thoroughly described in her summary judgment opinion, CCLP's status as a joint employer is a question of law aimed at resolving whether, under all the circumstances, the worker is dependent on the putative employer as an economic reality. *Garcia-Celestino*, 2013 WL 3816730, at *5; *see also Goldberg v. Whitaker House Coop., Inc.*, 366 U.S. 28, 33, 81 S. Ct. 933, 936–37 (1961); *Antenor v. D&S Farms*, 88 F.3d 925, 929–30 (11th Cir. 1996); *Aimable*, 20 F.3d at 439.   In *Aimable*, the Eleventh Circuit set out an eight-factor test to analyze joint employer claims under the FLSA.   20 F.3d at 439–45; *see Layton v. DHL Express (USA), Inc.*, 686 F.3d 1172, 1177 (11th Cir. 2012); *Antenor*, 88 F.3d at 932.   This *Aimable* factor test applies with equal force to Plaintiffs' FLSA claims and contract claims under the H-2A regulations.[26]   *Garcia-Celestino*, 2013 WL 3816730, at *5 (citing cases); *see Sejour*, 28 F. Supp. 3d at 1226–27 ("The Courts have held that the definition of 'employ' under the H–2A regulations is similar to the definition provided by the FLSA."); *Guijosa-Silva v. Wendell Roberson Farms, Inc.*, 10 C 17, 2012 WL 860394, at *19 (M.D. Ga. Mar. 13, 2012).

Before assessing the merits of Plaintiffs' joint employer theory under *Aimable*, we review several guiding principles.   "First, the question . . . is not whether the worker is more economically dependent on the independent contractor or the grower, with the winner avoiding responsibility as an employer."   *Antenor*, 88 F.3d at 932; *see Layton*, 686 F.3d at 1177.   Rather, we must focus our inquiry "'on each employment relationship as it exists between the worker and the party asserted to be a joint employer.'"   *Antenor*, 88 F.3d at 932 (quoting H.R. Rep. No. 97–885, 97th Cong., 2d Sess. (1982) 6, *reprinted in* 1982 U.S.C.C.A.N. 4547, 4552).

---

[26] We decline the parties' invitations to revisit Judge Chappell's rulings on the applicable legal framework.  (*See, e.g.*, Pls. Post-Tr. Mem. at 3 n.4; CCLP Post-Tr. Mem. at 15.)  Based on our independent review of the legal landscape, we agree with Judge Chappell's reasoning and continue to rely on the *Aimable* factors to evaluate the remaining FLSA and contractual claims.

Second, and as noted earlier, the analysis takes account of all relevant circumstances, such that "no one factor is determinative." *Antenor*, 88 F.3d at 932; *Aimable*, 20 F.3d at 439; *see Layton*, 686 F.3d at 1177. Third, we consider the *Aimable* factors "because they are indicators of economic dependence" and thus are tools to help us "gauge the degree of dependence of alleged employees." *Antenor*, 88 F.3d at 932. Within the context of the case, "the weight of each factor depends on the light it sheds on the farmworkers' economic dependence (or lack thereof) on the alleged employer." *Id.*; *see Layton*, 686 F.3d at 1177. Fourth, we recognize that "[t]he joint employment relationship is not determined by a mathematical formula." *Antenor*, 88 F.3d at 932. As we consider each factor, we need not "place each in either the contractor or the grower's column" but instead we "view them qualitatively to assess the evidence of economic dependence, which may point to both." *Id.* at 933; *see Layton*, 686 F.3d at 1178; *Charles v. Burton*, 169 F.3d 1322, 1333–34 (11th Cir. 1999); *Sejour*, 28 F. Supp. 3d. at 1227.

In addition, "we must not allow common-law concepts of employment to distract our focus from economic dependency." *Antenor*, 88 F.3d at 933; *Layton*, 686 F.3d at 1178. The relevant "suffer or permit to work" standard—included in the FLSA and adopted by the H-2A regulations applicable for the harvesting seasons at issue here—"was developed to assign responsibility to businesses that did not directly supervise putative employees." *Antenor*, 88 F.3d at 933 (citing *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 728 & n.7, 67 S. Ct. 1473, 1476 & n.7 (1947).) Finally, we recognize that the FLSA is a remedial statute and must be construed broadly. *Antenor*, 88 F.3d at 933.

### *1.* **Aimable** *Analysis*

With those principles in mind, we turn to review and apply each of the eight *Aimable* factors to the facts of this case.  We will then weigh the factors collectively and qualitatively. *See Antenor*, 88 F.3d at 933.

### a. **Nature and Degree of Control of the Harvesters**

In this first factor, we focus on CCLP's control of the harvesters' work.  As the *Aimable* court explained, "[c]ontrol arises . . . when the farmer goes beyond general instructions, such as how many acres to pick in a given day, and begins to assign specific tasks, to assign specific workers, or to take an overly active role in the oversight of the work."  20 F.3d at 441.  A grower may play such an "overly active role" if it makes decisions such as: "(1) for whom and how many employees to hire; (2) how to design the employees' management structure; (3) when the work day begins; (4) when the laborers shall start and stop their work throughout the day; and (5) whether a laborer should be disciplined or retained."  *Layton*, 686 F.3d at 1178; *Antenor*, 88 F.3d at 933; *see also Tafalla v. All Florida Dialysis Servs., Inc.*, 07 C 80396, 2009 WL 151159, at *6 (S.D. Fla. Jan. 21, 2009).

Here, although CCLP required RHI to participate in the H-2A program, it did not demand that RHI hire specific individuals and did not direct RHI's hiring process.  RHI alone chose who to hire, how to hire, and how many total employees to recruit from Mexico.  In addition, CCLP played no role in RHI's internal organization and operation.  CCLP did not assign RHI harvesters to specific RHI crews, nor was it involved in the training, discipline, or retention of the workers.  CCLP also did not decide when each crew began their day, took breaks, or finished their work.

CCLP plainly expected the harvesters to begin picking citrus early in the day and to continue working until they had filled the appropriate number of trailers.  CCLP also assigned RHI particular blocks.  On the whole, however, we find that this factor weighs against finding that CCLP was Plaintiffs' joint employer.

### b. Degree of Supervision, Direct or Indirect, of the Harvesters' Work

This second factor assesses CCLP's oversight of the harvesters' work.  "Supervision can be present regardless of whether orders are communicated directly to the alleged employee or indirectly through the contractor."  *Layton*, 686 F.3d at 1178–79; *Antenor*, 88 F.3d at 934; *Aimable*, 20 F.3d at 441.  In an agricultural setting, a "grower is not expected to look over the shoulder of each farmworker every hour of every day."  *Antenor*, 88 F.3d at 935.  Nonetheless, "'Infrequent assertions of minimal oversight do not constitute the requisite degree of supervision'" to satisfy this factor.  *Layton*, 686 F.3d at 1179 (quoting *Martinez-Mendoza v. Champion Int'l Corp.*, 340 F.3d 1200, 1211 (11th Cir. 2003)); *Aimable*, 20 F.3d at 441.

As Judge Chappell also suggested at the summary judgment stage, we conclude that CCLP supervised the harvesters in substantial ways.  *See, e,g.*, *Garcia-Celestino*, 2013 WL 3816730, at *9.  CCLP assigned RHI to particular blocks, advised how many workers would be needed for each block, and clocked the workers in and out on a daily basis.  CCLP harvesting supervisors checked in on each RHI crew roughly eight times each day, for ten to fifteen minutes.  During those visits, and in addition to filling out trip tickets, CCLP supervisors checked for shiners, garbage, debris in tubs or trailers, and apparent safety hazards.  CCLP personnel also checked for toilets, hand washing facilities, and potable water.  (2/13/14 Tr. (Delgado) at 137, 142–44.)  CCLP personnel would address any related problems with RHI supervisors, pointing out shiners, low power lines, etc.

CCLP supervisors also ensured that RHI personnel and harvesters complied with its citrus canker procedures, particularly in the 2007–2008 harvest season.  It directed the harvesters to walk through an anti-bacterial mist upon entering and exiting the groves.  CCLP required the harvesters to dip their picking sacks into a barrel of decontamination solution, which CCLP prepared.  CCLP directly supervised RHI personnel as they rinsed equipment, including tubs and goats.  Occasionally, CCLP also inspected RHI's vehicles to verify that the "harvesters, tools, and equipment were decontaminated."  (Stip. No. 46.)  CCLP reserved the right to quarantine any worker for a day after working in an infected grove, even if witnesses did not recall any quarantine taking place.

Based on the record facts, we conclude that this factor strongly supports Plaintiffs' joint employer theory.  It is irrelevant that CCLP supervisors did not speak directly to the RHI harvesters, that it treated its inhouse workers differently in some respects, or that the workers may not have been aware of CCLP's existence.  *Aimable*, 20 F.3d at 441; *Hodgson v. Griffin & Brand of McAllen, Inc.*, 471 F.2d 235, 238 (5th Cir. 1973) ("The fact that appellant effected the supervision by speaking to the crew leaders, who in turn spoke to the harvest workers, rather than speaking directly to the harvest workers does not negate a degree of apparent on-the-job-control over the harvest workers.").  "Joint employment relationships in agriculture often involve this sort of indirect supervision."  *Fanette v. Steven Davis Farms, LLC*, 28 F. Supp. 3d 1243, 1259 (N.D. Fla. 2014).  Indeed, as the Eleventh Circuit explained in *Antenor*, "the 'suffer or permit to work' standard was developed in large part to assign responsibility to business which did *not* directly supervise the activities of putative employees." 88 F.3d at 934–35.  The record demonstrates that CCLP harvesting supervisors monitored the harvesters several times each day

and instructed RHI personnel to remedy any identified problems, ample evidence that CCLP acted as a joint employer.

Moreover, it is undisputed that CCLP enforced its citrus canker procedures and that it reserved the right to halt the harvesters' work for *any* reason.  CCLP representatives testified that they did so as needed, whether due to weather, lapsed insurance, crew performance, or the schedule of the processing plants.  (*See, e.g.*, 2/19/14 Tr. (Shelton) at 120–21; 2/19/14 Tr. (Berginc) at 169–71.)  Consistent with these facts, this factor weighs heavily in Plaintiffs' favor.

### c.  Right to Hire, Fire, or Modify the Harvesters' Employment Conditions

Next we evaluate the extent of CCLP's authority to hire, fire, or modify the employment conditions of the harvesters.  *Layton*, 686 F.3d at 1179; *Antenor*, 88 F.3d at 935; *Aimable*, 20 F.3d at 442.  In considering this factor, which is similar to the first, courts look to whether the putative employer determines hiring or firing decisions, the number of hours to be worked per day, job qualifications, and the like.  *Layton*, 686 F.3d at 1179; *Antenor*, 88 F.3d at 935; *Aimable*, 20 F.3d at 442.

Although CCLP required RHI to participate in the H-2A program, it did not demand that RHI hire or fire specific individuals.  As noted earlier, RHI chose who to hire, how to hire, and how many total employees to recruit.  CCLP did not participate in any specific decisions concerning qualification, termination, training, or discipline of the harvesters.[27]

CCLP told RHI when the harvest began, based largely on the processing plant schedule and fruit maturity.  CCLP did not instruct Plaintiffs when to begin their day, take breaks, or

---

[27] We are not convinced that CCLP's auditing of RHI's payroll or other documentation affects this analysis.  CCLP checked documentation but did not conduct further investigation and, so far as we know, did not demand that RHI take any action with respect to particular employees based on its audits.

finish for the day.  On the other hand, CCLP allotted RHI a certain number of trailers it could fill

per day and did not allow it to fill more, thereby controlling the amount of work to be

accomplished by the harvesters.

On the whole, CCLP required contractors to obtain H-2A labor and assigned work at a

higher level, but it did not help make human resources decisions as to specific workers.  As a

result, we conclude that this factor slightly favors CCLP's position.

### d.      Power to Determine Pay Rates or Methods of Payment

This fourth factor asks whether the grower has the authority to set the harvesters' pay rate

or method of payment.  *Antenor*, 88 F.3d at 935–36; *Aimable*, 20 F.3d at 442; *Tafalla*, 2009 WL

151159, at *7.  "Method of payment refers to the basis upon which a worker is paid, for example,

by the hour or by the piece."  *Antenor*, 88 F.3d at 936; *Aimable*, 20 F.3d at 442.  Pay rate also

includes "benefits, such as worker's compensation insurance."  *Antenor*, 88 F.3d at 936.

As discussed in detail earlier, RHI alone set Plaintiffs' pay method and pay rates.  Ruiz

elected to pay the harvesters a piece-rate wage and set the final piece rate, which Ruiz provided

to Celaya.  RHI also obtained its own workers' compensation insurance.  Although the contracts

with CCLP required RHI to hold such insurance, CCLP did not affect RHI's choice of a provider

or pay RHI separately for it.  *See, e.g.*, *Antenor*, 88 F.3d at 936.  This factor weighs solidly

against a finding of joint employment.

### e.      Preparation of Payroll and Payment of Harvesters' Wages

We next consider the extent of the putative employer's involvement in the payroll

procedures and wage payments.  *Antenor*, 88 F.3d at 936; *Aimable*, 20 F.3d at 442; *Tafalla*, 2009

WL 151159, at *8.  "This factor is probative of joint employment because of the likelihood that

when a business undertakes to help an independent contractor prepare its payroll and pay its

wages, it is likely that the contractor lacks economic substance on which the workers can solely depend." *Antenor*, 88 F.3d at 936.

CCLP owned the timekeeping equipment, created identification badges for the harvesters, and scanned the workers in and out on a daily basis.  CCLP provided daily reports to RHI personnel summarizing the workers' hours and emailed a weekly report to Celaya for her use in preparing payroll.  Importantly, prior to sending the weekly report to Celaya, CCLP unilaterally deducted "up to one hour per workday . . . to account, in part, for travel time between the gate at the grove entrance and the actual picking site."  (Stip. No. 28.)  When she completed the weekly payroll, Celaya returned a file directly to CCLP with the gross and net earnings of each harvester.  It is also undisputed that CCLP determined that the harvesters should be paid by direct deposit for the 2008–2009 season.

RHI, with Celaya's assistance, managed its payroll and directly paid the workers.  Nonetheless, the evidence shows that CCLP was intimately involved in payroll procedures and decisions affecting Plaintiffs and their overall pay.  This factor unquestionably supports a conclusion that CCLP was the harvesters' joint employer.

### f.       Whether the Work Was Performed on CCLP Property

The next element is indicative of a joint employment relationship "for the obvious reason that without the land, the worker might not have work, and because a business that owns or controls the worksite will likely be able to prevent labor law violations, even if it delegates hiring and supervisory responsibilities to labor contractors."  *Antenor*, 88 F.3d at 936; *Layton*, 686 F.3d at 1180.

There is no question that CCLP owns the groves where the harvesters labored.  As such, this factor favors finding that CCLP was the harvesters' joint employer.

### g.      Whether the Harvesters' Work Was Integral to CCLP's Business

This factor asks whether the harvesting of the fruit completed by the workers was integral to CCLP's business.  According to Eleventh Circuit in *Antenor*, this factor is relevant "because a worker who performs a routine task that is a normal and integral phase of the grower's production is likely to be dependent on the grower's overall production process."  88 F.3d at 937 (finding this factor favored plaintiffs, who harvested and packed snap beans); *Layton*, 686 F.3d at 1180; *see also Aimable*, 20 F.3d at 442 (finding this factor favored plaintiffs who "performed a line-job integral to the harvesting and production of salable vegetables").

The parties do not dispute that "harvesting [is] an integral part of CCLP's business of producing citrus fruit for processing into juice."  (Stip. No. 2; 2/12/14 Tr. (Lucas) at 23.)  This factor therefore supports Plaintiffs' joint employer theory.

### h.      Investment in Equipment and Facilities

Finally, we consider "the relative degree of investment in equipment and facilities by the independent contractor on the one hand, and the putative employer on the other."  *Antenor*, 88 F.3d at 937; *Layton*, 686 F.3d at 1181.  This factor informs our inquiry because "workers are more likely to be economically dependent on the person who supplies the equipment or the facilities."  *Layton*, 686 F.3d at 1181; *Antenor*, 88 F.3d at 937; *see, e.g.*, *Cruz-Lovo v. Ryder Sys., Inc.*, 298 F. Supp. 2d 1248, 1259 (11th Cir. 2003).

We conclude that the evidence pertinent to this factor favors CCLP's position.  RHI, not CCLP, provided the guestworkers with housing, as well as transportation to and from the groves.  RHI provided all of the equipment used by Plaintiffs personally on a daily basis:  picking sacks, ladders, and tubs.  It provided the goats operated by the RHI crew leaders.  Additionally, RHI was responsible for offering and maintaining the field sanitation equipment for the workers.

Although CCLP owned the groves, the timekeeping equipment, and the equipment and chemicals for the citrus canker protocol, the evidence demonstrates that RHI invested heavily in the equipment necessary for its business as a labor contractor.  This substantial level of investment makes sense as a practical matter, especially because RHI was free to work for growers other than CCLP if it chose to do so.  (2/20/14 Tr. (Bartos) at 22.)  Because RHI provided the equipment necessary for Plaintiffs to complete their work, this factor weighs against finding CCLP liable as a joint employer.

### i.        Balancing of All of the Factors

Having evaluated the factors individually, we turn to weigh them collectively and qualitatively.  At a superficial glance, the factors appear split between outcomes.  Four factors favor finding in Plaintiffs' favor, while four favor finding in CCLP's favor.  Taking a closer look, we see that this split is deceiving.

The first and third factors somewhat support CCLP's defense, but they are also very similar.  Both focus on facts concerning CCLP's lack of involvement in RHI's hiring and human resources practices.  The fourth factor (pay rates and methods) and the eighth factor (investment in equipment) more soundly support CCLP's position and evidence Plaintiffs' economic dependence on RHI, rather than CCLP.

The remaining four factors, however, unequivocally weigh in favor of Plaintiffs' joint employer theory.  The record supporting these factors demonstrates that Plaintiffs provided an integral service for CCLP, by harvesting the fruit grown on CCLP property.  As Plaintiffs completed the harvest, CCLP indirectly but extensively supervised them, on a daily basis.  CCLP was also directly involved in payroll practices.  Not only did it own and operate the

43

timekeeping equipment, it also unilaterally imposed the one-hour gate deduction, thereby affecting Plaintiffs' pay.[28]

Bearing in mind the totality of the circumstances on the full record before us, we readily conclude that Plaintiffs were economically dependent on CCLP. *See Antenor*, 88 F.3d at 932 (instructing us to focus on "each employment relationship"). As such, we conclude that Plaintiffs were jointly employed by both RHI and CCLP, within the meaning of the FLSA and H-2A regulations.

### 2.       *Violations and Damages*

Having found that CCLP was Plaintiffs' joint employer, we briefly discuss its liability for Plaintiffs' claims.

### a.       **H-2A Contractual Violations**

Plaintiffs alleged that they did not receive their wages "free and clear" because RHI personnel required them to kickback their build-up pay, resulting in wage rates that did not satisfy AEWR. The facts of this case, as we found earlier, overwhelmingly substantiate Plaintiffs' theory.[29] *Arriaga*, 305 F.3d at 1235–36 (holding that FLSA requirements apply to H-2A workers, including the requirement that all wages be provided "free and clear" of improper deductions); *see also Ramos-Barrientos v. Bland*, 661 F.3d 587, 594–95 (11th Cir. 2011); *De Leon-Granados v. Eller & Sons Trees, Inc.*, 581 F. Supp. 2d 1295, 1308 (N.D. Ga. 2008) (noting that the FLSA is a remedial statute intended to "protect workers who lack sufficient bargaining power to secure a subsistence wage"). We therefore find in favor of Plaintiffs, and against CCLP, on the contractual H-2A claims.

---

[28] The legality of that deduction has not yet been addressed. CCLP's conduct in making the deduction, however, is critical to our assessment of its involvement in RHI payroll procedures.
[29] CCLP did not seriously dispute, at trial or in briefing, that the kickbacks resulted in AEWR violations.

We further intend to award Plaintiffs the full amount of damages sought for their H-2A claims.  We rely on Amento's expert testimony, which we find wholly credible and very helpful for setting a value for each guestworker's H-2A claim.

Because of the outstanding issues concerning both the FLSA and gate deduction claims, we need not enter final judgment on the H-2A claims at this time.  We will enter final judgment, including damages totals, once we have resolved the outstanding issues.

### b.        FLSA Violations for Failure to Reimburse

As detailed earlier, CCLP has identified several valid concerns with Plaintiffs' proof as to Plaintiffs' FLSA claims.  The parties shall submit their supplemental briefs, in the timing and manner described earlier.

### c.        Gate Deduction Claims Question

As discussed in our February 4, 2014 opinion addressing CCLP's motion in limine, we will reopen discovery to allow the parties to complete their investigation into Plaintiffs' gate deduction claims.  (Dkt. No. 191.)  All discovery on this open question must be completed by October 31, 2015.

An evidentiary hearing addressing the gate deduction claims will be held on January 11, 2016.  At the hearing, we will set a post-trial briefing schedule on the merits of the gate deduction claims.

**CONCLUSION**

For the reasons set forth above, we conclude that CCLP was Plaintiffs' joint employer and is liable to them for AEWR violations.  Final judgment shall issue at a later date.

Plaintiffs shall file their supplemental brief on the outstanding FLSA questions by July 31, 2015.  CCLP may file a response on or by August 31, 2015, and Plaintiffs may file a reply on or by September 14, 2015.

In addition, the parties shall begin supplemental discovery into the gate deduction claims, with discovery to close on October 31, 2015.  An evidentiary hearing on these claims is scheduled for January 11, 2016.  On or by November 13, 2015, the parties shall inform the court if they plan to present witnesses at the evidentiary hearing and how long they anticipate the hearing should last.

SO ORDERED:

_____
Marvin E. Aspen
United States District Judge

Dated: May 28, 2015
         Chicago, Illinois